## ALICIA LOUIS'S CASE.

Suffolk. December 3, 1996. - January 15, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, O'CONNOR, GREANEY, & FRIED, JJ.

*Workers' Compensation Act,* Amount of compensation, Average weekly wages, Previous work-related injury. *Words,* "Average weekly wage."

Partial disability benefits received pursuant to G. L. c. 152, § 35, by an injured worker who had returned to work in a modified capacity at a reduced average weekly wage were properly includable in the definition of earnings set forth in G. L. c. 152, § 1(1), for purposes of ascertaining the amount of permanent and total disability benefits under G. L. c. 152, § 34A, due the worker on account of a subsequent permanently disabling injury. [139-143]

APPEAL from a decision of the Industrial Accident Reviewing Board.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Paul M. Moretti* for the employee.

*Peter M. McElroy* for Public Service Mutual Insurance Company.

*Martin B. Schneider* for American Mutual Insurance Company.

FRIED, J. The employee, Alicia Louis, appeals from a decision of the reviewing board (board) of the Department of Industrial Accidents (department). A split board determined that the partial disability payments Louis was receiving for a previous work-related injury should not be included in the calculation of her average weekly wage used to determine her compensation for a subsequent injury. *Louis* v. *Anthony's Pier Four,* 8 Mass. Workers' Comp. Rep. 311 (1994). We transferred the case to this court on our own motion. We reverse the board's holding that partial disability benefits cannot be included in an employee's average weekly wage.

I

Alicia Louis is a seventy year old woman who was

employed by Anthony's Pier Four Restaurant (Pier Four) for several years as a hostess cashier until she injured her back on January 14, 1982, in the course of her employment. She was admitted to University Hospital with a herniated disc until February 7, 1982, and remained away from work until March 27, 1982, at which time she returned to Pier Four to work part time in a modified capacity.

At the time of Louis's initial injury, Pier Four was insured by Public Service Mutual Insurance Company (Public). While Louis was away from work, Public paid her temporary total incapacity benefits under G. L. c. 152, § 34, of $134.18 a week, based on an average weekly wage of $201.26 which Louis had been earning prior to her injury. When she returned to work in her modified capacity, Louis was able to earn an average of $70.22 a week. Louis's § 34 benefits were discontinued and Public began paying her partial incapacity benefits under G. L. c. 152, § 35, at a rate of $131.06. When these partial disability benefits were added to Louis's weekly earnings of $70.22, Louis was able to receive an amount equal to her previous earnings of $201.26.[1]

On August 1, 1986, Louis sustained further injuries as a result of a fall she suffered in the course of her part-time employment. The fall damaged Louis's knees, lower back, and cervical spine, forcing her to leave her employment permanently. At the time of Louis's second injury, Pier Four was insured by American Mutual Insurance Company (American Mutual), which began paying Louis temporary total incapacity benefits under § 34 at the rate of $58.34, an amount which equalled two-thirds of Louis's previous part-time earnings of $70.22.[2] Public continued to pay partial incapacity benefits under § 35 "until the statutory maximum was reached on or about March 1992." *Louis, supra* at 312.

On August 1, 1991, Louis exhausted her temporary total incapacity benefits under § 34 which were limited to a

---

[1]The sum actually exceeded Louis's former earnings by two cents. Under G. L. c. 152, § 35, as appearing in St. 1981, c. 572, § 2, partial incapacity benefits were meant to fill "the entire difference between [the employee's] average weekly wage before the injury and the average weekly wage he is able to earn thereafter."

[2]American has since become insolvent and, under the provisions of G. L. c. 175D (1994 ed.), its obligations were assumed by the Guaranty Fund/Helmsman Management. We shall refer to the second insurer as American Mutual throughout this opinion.

compensation period of not more than 260 weeks.[3] At that time, Louis entered a claim against American Mutual for permanent and total incapacity benefits under § 34A in addition to a claim she entered against Public for § 34A benefits arising out of her original injury.

The claims for § 34A benefits initially arose in a prehearing conference on February 24, 1992, before an administrative judge who denied the claim against Public and ordered American Mutual to pay Louis § 34A benefits at the rate of $58.34 a week, based on an average weekly wage of $70.22. Both American Mutual and Louis appealed, although American Mutual subsequently withdrew its appeal. On March 4, 1993, another administrative judge filed his decision. According to the judge, the single issue for determination was, "whether the partial disability payments collected by the employee at the time of her second injury should be included in the calculation of her average weekly wage" used to determine benefits under § 34A. The judge answered this question in the negative, holding that such inclusion was not permitted under the workers' compensation statute. A divided panel of the board affirmed the judge's decision, suggesting that "[a]lthough the result reached here creates a disincentive for an employee to return to work," an ameliorative solution would have to await legislative action. *Louis, supra* at 315.

## II

An employee's average weekly wage is defined in G. L. c. 152, § 1 (1), as "the earnings of the injured employee during the period of twelve calendar months immediately preceding the date of injury, divided by fifty-two."[4] This case presents an issue of first impression, as we have not previously determined whether partial disability payments received by an employee following a work-related injury should be included in the calculation of an employee's average weekly

---

[3]This section has since been amended so that a claimant can receive benefits under § 34 for a period of not more than 156 weeks. St. 1991, c. 398, § 59.

[4]The section also includes alternative provisions for calculating an employee's average weekly wage if the injured employee lost more than two weeks of work during the previous year or the length of employment was so short that a calculation under the basic provision would be impractical.

wage for purposes of compensating that employee when she incurs subsequent injury in the course of her employment.[5]

Louis correctly points out that the board's decision "works to unjustly penalize an employee who in good faith returned to work in an effort to minimize her disability." The difficulty in this case resides in the fact that, like *Sliski's Case, ante* 126 (1997), this case addresses a potential uncertainty in our workers' compensation scheme which has long been unresolved: What is the appropriate level of compensation for an employee who is receiving partial compensation for a previous injury if that employee is subsequently injured in the course of less-remunerative employment? See L. Locke, Workmen's Compensation § 343, at 403 (2d ed. 1981). The board rejected Louis's argument that her average weekly wage for § 34A benefits should be computed by referring back to the average weekly wage on which her partial incapacity benefits were based as well as her argument that the nature and terms of her employment made it impracticable to compute an average weekly wage under § 1 (1)'s basic provision. We also reject these contentions. In the circumstances before us, using the employee's average weekly wage at the time of her first injury to compute average weekly wages at the time of a subsequent injury does not comport with the instructions of § 1 (1) which direct us to determine an employee's average weekly wages by examining the employee's earnings "during the period of twelve calendar months immediately preceding" the injury.[6] But see *Stone's Case*, 318 Mass. 658, 661 (1945). Nor does § 1 (1) justify a finding of impracticability where the employee was employed in the same position for nearly four years before the second injury, making a twelve-month wage calculation easily ascertainable.

What we decline to affirm is the board's holding that partial

---

[5]The board was faced with this issue once as an ancillary issue in *Hunnicutt* v. *General Dynamics*, 5 Mass. Workers' Comp. Rep. 215 (1991), but did not have to address it because the board found the employee had not been entitled to partial disability benefits at all.

[6]In *Sliski's Case, ante* 126 (1997), we determined that it was appropriate to refer back to Sliski's skills, abilities, and employment prospects at the time of his first injury. Reference back to Sliski's initial injury was appropriate under G. L. c. 152, § 51 (1994 ed.), which addresses the situation of young employees injured early in their careers and instructs us that an employee's benefits are "not [to] be limited to the circumstances of the employee's particular employer or industry at the time of injury."

incapacity benefits do not fit within the § 1 (1) definition of average weekly wage. We have noted before that while § 1 (1) makes reference to "the earnings of the injured employee," it "does not detail the categories of benefits factored into the determination of such 'earnings.' " *Borofsky's Case*, 411 Mass. 379, 380 (1991). In the past we have read this provision to include tips, *Powers's Case*, 275 Mass. 515, 520 (1931); commissions, *Perkins's Case*, 278 Mass. 294, 301-302 (1932); and room and board, *Palomba's Case*, 9 Mass. App. Ct. 881 (1980). We have adopted an "interpretive approach" to this section, recognizing that "our workers' compensation act 'sets up a system of money payments for the loss of earning capacity sustained by an employee by reason of a work-connected injury,' " *Gunderson's Case*, 423 Mass. 642, 644 (1996), quoting L. Locke, Workmen's Compensation § 301, at 344 (2d ed. 1981), and it should "be interpreted in the light of its purpose and, so far as reasonably may be, to promote the accomplishment of its beneficent design." *Young* v. *Duncan*, 218 Mass. 346, 349 (1914). In 1991, following our decision in *Borofsky's Case, supra,* which held that health insurance benefits were not a component of an employee's average weekly wage, § 1 (1) was amended to include language that "such fringe benefits as health insurance plans, pensions, day care, or education and training programs provided by employers shall not be included in employee earnings for the purpose of calculating average weekly wages under this section." St. 1991, c. 398, § 13. The board reviewing Louis's claim rejected partial disability payments as a component of average weekly wage with the explanation that such benefits "are not 'earnings' but a substitute therefor." *Louis, supra* at 313. It is precisely because these benefits are awarded to compensate the employee for earnings they would have received, but for an industrial injury, see *Don Francisco's Case*, 14 Mass. App. Ct. 456, 460 (1982), that we are willing to include these § 35 benefits within the definition of § 1 (1). Not only do these benefits "bear a close analogy to wages paid by [the employer]," *Powers's Case, supra* at 519, but they are provided by our workers' compensation statutes as a direct substitute for such wages — not fringe benefits by any interpretation, but compensation provided to meet an employee's fundamen-

tal needs which propelled her to seek employment in the first place.[7]

American Mutual argues that this inclusion would impose an unjust burden on an insurer who relied on the employee's stated wage when it calculated the employer's contractual premium and thus would expose the insurer to risks it did not contemplate. While this may be true, such a risk is always a possibility under the Massachusetts successive insurer rule which requires the insurer on the risk at the time of a subsequent injury to compensate an employee for the incapacity which results from a series of industrial accidents, even if those injuries occurred while another insurer was on watch and the ultimate incapacity is substantially worsened by virtue of the earlier injury.[8] See *Sliski's Case, supra* at 133; *Carrier v. Shelby Mut. Ins. Co.*, 370 Mass. 674, 675 (1976). Recognizing that this rule may require insurers to pay more than they initially contemplated, the Legislature enacted § 37 of the workers' compensation act which provides second insurers with a possibility of reimbursement for up to seventy-five per cent of the compensation they are required to provide when an employee with a known physical impairment which is likely to be an obstacle to employment suffers "a personal

---

[7]The board was concerned lest the interpretation of § 1 (1) we give now would force us to include social security disability benefits, private disability insurance, veteran's disability benefits, disability pensions, or other similar forms of monetary payment an employee might be receiving at the time of injury in the calculation of an average weekly wage. We reject this concern, recognizing that while these other revenue sources resemble partial disability benefits to the extent that they insure an employee against economic hardship and disability, this similarity is not enough to place them within the compass of § 1 (1). Our workers' compensation act explicitly states that "[e]xcept as expressly provided elsewhere in this chapter, no savings or insurance of the injured employee *independent of this chapter* shall be considered in determining compensation payable thereunder, nor shall benefits derived from any other source than the insurer be considered in such determination" (emphasis supplied). G. L. c. 152, § 38 (1994 ed.). Partial disability benefits, however, are explicitly created by c. 152 and contemplated by the workers' compensation act as a form of substitute earnings and are thus appropriately included within an employee's earnings for purposes of the act's definition of average weekly wage.

[8]The board's dissenting member aptly recognized that the majority's position appears to violate the intent of the successive insurer rule by "effectively limit[ing] compensation carrier responsibility to the effects of the final injury." *Louis v. Anthony's Pier Four*, 8 Mass. Workers' Comp. Rep. 311, 316 (1994) (Fischel, J., dissenting).

injury for which compensation is required by this chapter and which results in disability that is substantially greater by reason of the combined effects of such impairment and subsequent injury." G. L. c. 152, § 37 (1994 ed.). Although the reimbursement provided by this section is not available until the insurer has paid benefits for two years, the insurer capable of spreading risks is certainly better equipped to bear this burden than the employee who has lost her means of earning a livelihood. Section 37 expresses a legislative policy to encourage employees to return to work and helps alleviate disincentives which might prevent their being rehired. See *Sliski's Case, supra* at 133. Including partial incapacity benefits within an employee's average weekly wage comports with the purpose behind § 37 and "the policy that the industry should bear the burden of industrial accidents." *Mizrahi's Case,* 320 Mass. 733, 736 (1947).

The board rejected Louis's proposal because it determined Louis's dilemma required a legislative solution. We have held that Louis's average weekly wage can be understood more inclusively without resort to the Legislature, but we note that our present holding is not likely to effect as favorable a solution for some other workers who may find themselves in this same predicament in the future. While including partial disability benefits in her average weekly wage allows Louis to attain her entire preinjury 1982 weekly wage, subsequent amendments to G. L. c. 152 have altered the scenario for others. When Louis was first injured, § 35 required an insurer to pay the injured employee "a weekly compensation equal to the entire difference between his average weekly wage before the injury and the average weekly wage he is able to earn thereafter." G. L. c. 152, § 35, as appearing in St. 1981, c. 572, § 2. Today § 35 limits an employee who is partially incapacitated to sixty per cent of this difference, G. L. c. 152, § 35 (1994 ed.), reducing the extent to which partial disability benefits can help ease the combined losses resulting from successive injuries. Additionally, partial disability benefits eventually run out, and that was the case even before the more recent revisions. Under our current statute, an employee can receive such compensation for not more than five years (260 weeks). *Id.* Thus, if an employee suffers a subsequent injury after these benefits have run out so that these benefits have not been a part of her earnings "during

the period of twelve calendar months immediately preceding the date of injury," the injured employee will not be able to include them as a component of her average weekly wage, and her benefit will be calculated only according to the reduced wages of her subsequent employment, whether it was less remunerative than the position she filled prior to her initial injury or not. A more comprehensive solution will have to await legislative attention.

We remand this case for further proceedings consistent with this opinion.

*So ordered.*