## William McCarty's Case.[1]

Suffolk. September 8, 2005. - November 23, 2005.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Workers' Compensation Act,* Average weekly wages. *Statute,* Construction.

This court concluded that the the plain language of G. L. c. 152, § 1 (1), made mandatory the inclusion of certain fringe benefits in the determination of average weekly wages for purposes of calculating workers' compensation benefits for a unionized employee who was injured working on an all-union public works project. [362-368] Sosman, J., concurring, with whom Marshall, C.J., and Cordy, J., joined.

Appeal from a decision of the Industrial Accident Reviewing Board.

*Myles W. McDonough* (*Mark H. Likoff* with him) for the insurer & another.

*Michael C. Akashian* for the employee.

The following submitted briefs for amici curiae:

*Timothy Wilton* for John Fleming & others.

*Karen S. Hambleton* for Massachusetts Academy of Trial Attorneys.

Ireland, J. This case concerns the proper calculation of "average weekly wages" under G. L. c. 152, § 1 (1), where a union worker is injured on an entirely union public works project and entitled to workers' compensation benefits. The reviewing board of the Department of Industrial Accidents (reviewing board) determined that employer payments into health and welfare plans, pension plans, and supplemental unemployment benefits (fringe benefits) must be included in determining the employee's average weekly wages. Because we conclude that the plain language of the applicable statutes, G. L. c. 152, § 1 (1), as

---

[1] We acknowledge amicus briefs submitted by the Massachusetts Academy of Trial Attorneys and by John Fleming, Edward Cannon, and Thomas McQuillan.

amended through St. 1991, c. 398, § 13, and G. L. c. 149, §§ 26 and 27, makes the inclusion of such employer payments mandatory, we affirm the reviewing board's decision.

*Facts and procedural history.* This case has a long, complex procedural history which we need not belabor. Suffice it to say, William McCarty (employee), a member of Local 3 of the Bricklayer's and Allied Craftsmen Union, worked for defendant Wilkinson & Company (employer) as a tile setter and grouter on Boston's third harbor tunnel project (project). He was injured in 1994 and received workers' compensation benefits from National Union Fire Insurance Company of Pittsburgh, Pennsylvania (insurer), until 2000. In March, 1996, an administrative judge concluded that because all the project's employees were unionized, the computation of the employee's average weekly wage should not include fringe benefits. On May 21, 1997, the reviewing board reversed the decision of the administrative judge, holding that the statutory scheme required the inclusion of fringe benefits. The case was remanded and the administrative judge amended his decision. Ultimately, the reviewing board affirmed his decision. The insurer and the employer appealed. We transferred their appeal from the Appeals Court pursuant to G. L. c. 211, § 4A.

*Discussion.* We begin by setting forth the relevant portions of the applicable statutes.

A permanently or partially incapacitated employee is entitled to receive compensation under the workers' compensation statute. G. L. c. 152, §§ 34, 35. The amount is based on certain formulas in the statute. *Id.* Those formulas include a calculation of the employee's average weekly wages.[2] General Laws c. 152, § 1 (1), defines "average weekly wages" for injured employees. The second paragraph of that definition, inserted by St. 1991, c. 398, § 13, states, in pertinent part:

> "*Except as provided by sections twenty-six and twenty-seven of chapter one hundred forty-nine,* such fringe benefits as health insurance plans, pensions, day care, or education and training programs provided by employer

---

[2] General Laws c. 152, §§ 34 and 35, set forth a minimum and maximum amount an injured employee may receive.

shall not be included in employee earnings for purposes of calculating the average weekly wages . . .'' (emphasis added).

General Laws c. 149, §§ 26 and 27, as amended through St. 1991, c. 552, § 94, and St. 1993, c. 110, § 173, respectively, referred to in the second paragraph of G. L. c. 152, § 1 (1), are part of the prevailing wage law, and allow the Commissioner of Labor and Industries to set wage rates on public works projects. *Felix A. Marino Co.* v. *Commissioner of Labor & Indus.*, 426 Mass. 458, 459 (1998). Section 26 states, in relevant part:

> "Payments by employers to health and welfare plans, pension plans and supplementary unemployment benefit plans under collective bargaining agreements or understandings between organized labor and employers *shall be included* for the purpose of establishing minimum wage rates as herein provided" (emphasis added).

Section 27 states, in relevant part:

> "The aforesaid rates of wages in the schedule of wages *shall include* payments by employers to health and welfare plans, pension plans and supplementary unemployment benefit plans as provided in [§ 26], and such payments *shall be considered* as payments to persons under this section performing work as herein provided. Any employer engaged in the construction of such works who does not make payments to a health and welfare plan, a pension plan and a supplementary unemployment benefit plan, where such payments are included in said rates of wages, shall pay the amount of said payments directly to each employee engaged in said construction" (emphasis added).[3]

It is the language in these provisions on which the reviewing board relied in concluding that fringe benefits must be included in the determination of the employee's average weekly wage.

The employer and the insurer make numerous arguments concerning the reviewing board's interpretation of the exception

---

[3]General Laws c. 149, § 27, also directs that "[w]hoever shall pay less" be punished or subject to a civil action or order and includes a private right of action by an aggrieved employee.

contained in G. L. c. 152, § 1 (1), second par., including that, in light of the purpose of the 1991 amendments to G. L. c. 152; the plain language of the statutes; and the legislative history of G. L. c. 149, §§ 26 and 27, the application of §§ 26 and 27 is limited to those instances where the workplace is a mix of union and nonunion employees and a nonunion employee is injured.[4]

"The work[ers'] compensation act is to be construed broadly, rather than narrowly, in the light of its purpose and, so far as reasonably may be, to promote the accomplishment of its beneficent design . . . . But it is also settled that, in construing a statute, its words must be given their plain and ordinary meaning according to the approved usage of language . . . and that the language of the statute is not to be enlarged or limited by construction unless its object and plain meaning require it." *Taylor's Case*, 44 Mass. App. Ct. 495, 499 (1998), quoting *Johnson's Case*, 318 Mass. 741, 746-747 (1945). The language of G. L. c. 152, § 1 (1), second par., is clear and unambiguous. There is nothing in the plain language of the exception to the rule that fringe benefits are not part of the calculation of average weekly wages that indicates that it does not apply to entirely union public works projects, as the employer and insurer argue. The language clearly and simply refers to those sections of G. L. c. 149, §§ 26 and 27, that require that the calculation of "minimum wage rates" include fringe benefits.[5] Had the Legislature intended to limit the exception to nonunion public works project employees, it could easily have done so. See *Commissioner of Revenue* v. *Cargill, Inc.*, 429 Mass. 79, 82 (1999) (court may not amend statute's language or infer legislative intention where language is clear).

Relying on *Taylor's Case*, *supra*, the employer and the insurer argue that the purpose of the 1991 overhaul of the statute was to decrease the costs of workers' compensation and, because the reviewing board's construction of G. L. c. 152, § 1 (1), increases benefits to union workers on public works projects,

---

[4]We have considered, but need not address, every argument the employer and the insurer have advanced in support of their interpretation of the statutes.

[5]The legislative history the employer and insurer provided sheds no light on the specific statutory provision at issue in this case.

the construction is erroneous. Even if the sole purpose of the 1991 amendments was to cut costs, the statutory scheme itself has a "beneficent design," *id.* at 499, and is considered a "humanitarian measure." *CNA Ins. Cos.* v. *Sliski*, 433 Mass. 491, 493 (2001), and cases cited. The employer and the insurer's interpretation would have us infer an intention on the part of the Legislature beyond the plain language of the statute. See *Commissioner of Revenue* v. *Cargill, Inc., supra.* Moreover, St. 1991, c. 398, § 16, added the phrase "or decreases" to § 2A, so that it now reads: "Every act, in amendment of this chapter . . . which increases or decreases the amount or amounts of compensation payable to an injured employee or his dependents . . . ." Although the addition of the phrase "or decreases" indicates, as the employer and the insurer assert, that one of the purposes of the 1991 legislation was to decrease benefits to injured employees, *Taylor's Case, supra* at 500-501, the Legislature did not strike the word "increases" from the statute, indicating at least that the Legislature recognized that some employees' benefits would increase because of changes to the statute.[6]

In addition, the second paragraph reconciled the statute with the decisions of the reviewing board prior to 1991. Before the enactment of G. L. c. 152, § 1 (1) second par., in cases where employees were members of unions and working on public works projects, the reviewing board determined that fringe benefits were part of the calculation by relying, as it did in this case, on the provisions of G. L. c. 149, §§ 26 and 27. See, e.g., *Lyons* v. *Fontaine Bros.*, 4 Mass. Workers' Comp. Rep. 398, 399 (1990); *Machado* v. *Joseph B. Fay Co.*, 3 Mass. Workers' Comp. Rep. 38, 40 (1989). In the *Machado* decision, it is clear that the public works project had hired both union and nonunion employees. *Id.* at 39. Because the *Lyons* decision states that the facts "are virtually identical" to those in the *Machado* case, we assume that workplace also contained a similar mix of employees. *Lyons* v. *Fontaine Bros., supra.* In a decision that

---

[6]The 1991 legislation also addressed responsibilities of employers in furnishing notice of injuries and the commencement of workers' compensation benefits. See, e.g., G. L. c. 152, §§ 6 & 7, as appearing in St. 1991, c. 398, §§ 18, 19, 20.

predates the *Lyons* decision, the reviewing board held that an employee who was not a union member and not on a public works project was *not* entitled to have health insurance benefits included in the calculation of his average weekly wages. *Barofsky* v. *Lundermac Co.*, 4 Mass. Workers' Comp. Rep. 135, 143-144 (1990). This court affirmed that decision on December 10, 1991, and stated that there were "policy considerations which favored both sides of this question, but they are more properly addressed to the Legislature which to date has left the definition of 'average weekly wages' unchanged despite a comprehensive revision of G. L. c. 152." *Borofsky's Case*, 411 Mass. 379, 381 (1991). It is presumed that the Legislature was aware of all of the these reviewing board decisions, and this court's decision, at the time it enacted St. 1991, c. 398, on December 23, 1991. See *Taylor's Case*, *supra* at 500, and cases cited.

The second paragraph comports with the *Borofsky* decision, in that it explicitly states that health insurance benefits are excluded from the determination of average weekly wages.[7] However, the stated exception also affirms the previous decisions of the reviewing board, in that it references G. L. c. 149, §§ 26 and 27, the very sections on which the reviewing board relied for authority to include fringe benefits in the *Machado* and *Lyons* decisions.

Moreover, in a decision involving an injury sustained after the enactment of St. 1991, c. 398, *Kelly* v. *Modern Continental*, 17 Mass. Workers' Comp. Rep. 172, 175 (2003), the reviewing board affirmed its earlier decisions and held that G. L. c. 149, §§ 26 and 27, applied to a union laborer injured on the job.[8] Contrast *Jerrett* v. *A. Ricciardelli & Sons*, 8 Mass. Workers' Comp. Rep. 389, 390 (1994) (denying union employee's request to include benefits in calculation of average weekly wages where employee not employed on public project). We grant

---

[7] We need not address whether the list of excluded fringe benefits is exhaustive.

[8] *Kelly* v. *Modern Continental*, 17 Mass. Workers' Comp. Rep. 172, 175 (2003), also relied on *McCarty* v. *Wilkinson & Co.*, 11 Mass. Workers' Comp. Rep. 285 (1997), the reviewing board's decision reversing the administrative judge's decision to exclude fringe benefits from the determination of average weekly wages.

substantial deference to the reviewing board's interpretation of G. L. c. 152. *Gateley's Case*, 415 Mass. 397, 399 (1993) ("interpretation of a statute by the agency charged with primary responsibility for administering it is entitled to substantial deference"). Given the plain language of the statute, the timing of its revision, and presuming that the Legislature was aware of the line of decisions issued by the reviewing board before 1991, we cannot say that the reviewing board erred in applying the exception contained in G. L. c. 152, § 1 (1), to this case. Contrast *Kszepka's Case*, 408 Mass. 843, 847 (1990) (reviewing board's incorrect interpretation of statute not entitled to deference). In any event, were there any ambiguity in the statute, the reviewing board's interpretation of the statute is entitled to our deference. *Richards's Case*, 62 Mass. App. Ct. 701, 706 (2004), and cases cited.

The employer and the insurer argue that reading G. L. c. 149, §§ 26 and 27, to include fringe benefits for union employees constitutes discriminatory treatment between two classes of employees, favoring the union employee in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution and art. 1 of the Massachusetts Declaration of Rights. We need not address this issue because we conclude that the employer and the insurer do not have standing to raise it. "[O]ne may not claim standing . . . to vindicate the constitutional rights of some third party," *Blixt* v. *Blixt*, 437 Mass. 649, 661 (2002), cert. denied, 537 U.S. 1189 (2003), quoting *Slama* v. *Attorney Gen.*, 384 Mass. 620, 624 (1981), because "[o]nly one whose rights are impaired by a statute can raise the question of its constitutionality, and he can object to the statute only as applied to him." *Blixt* v. *Blixt, supra*, quoting *Massachusetts Comm'n Against Discrimination* v. *Colangelo*, 344 Mass. 387, 390 (1962).[9]

*Conclusion.* For the reasons set forth above, we conclude that

---

[9]Moreover, even if they had standing, their cursory treatment of the issue is inadequate for appellate review. There is a presumption of the constitutionality of statutes and the parties have the "burden of proving the absence of any conceivable grounds upon which the statute may be supported," which requires more than the assertion of general conclusions of fact and law. *Merit Oil Co.* v. *Director of the Div. on the Necessaries of Life*, 319 Mass. 301, 305 (1946). See *Massachusetts Comm'n Against Discrimination* v. *Colangelo*, 344

the inclusion of fringe benefits in the determination of average weekly wages for a unionized employee working on an all-union public works project is required under the plain language of G. L. c. 152, § 1 (1). The decision of the reviewing board is affirmed.

*So ordered.*

Sosman, J. (concurring, with whom Marshall, C.J., and Cordy, J., join). The present case requires us to interpret the meaning of the exception set forth in G. L. c. 152, § 1 (1), as amended through St. 1991, c. 398, § 13, which cross-references the provisions of G. L. c. 149, §§ 26 and 27. Today's opinion holds that the meaning and scope of that cross-reference is a matter of "plain language" that is "clear and unambiguous." *Ante* at 361, 364, 365, 367, 368. In my view, the language is anything but "plain," "clear," or "unambiguous," and the interpretation given to that language today produces incongruous results, contrary to the ordinary purpose of the workers' compensation system, contrary to the stated purposes of the 1991 legislation, and unsupported by any countervailing purpose. I feel compelled to concur with this interpretation, however, due solely to the application of the presumption that the Legislature was aware of all agency decisions at the time it enacted the exception in G. L. c. 152, § 1 (1). *Kszepka's Case*, 408 Mass. 843, 847 (1990), citing *Condon* v. *Haitsma*, 325 Mass. 371, 373 (1950) (presumption that "Legislature knew preexisting law"). The reviewing board of the Department of Industrial Accidents (reviewing board) had previously interpreted G. L. c. 149, §§ 26 and 27, to require that the "average weekly wages" of a worker injured on a public works project include the employer's payments to employee fringe benefit plans. See *Lyons* v. *Fontaine Bros.*, 4 Mass. Workers' Comp. Rep. 398, 399 (1990); *Machado* v. *Joseph B. Fay Co.*, 3 Mass. Workers' Comp. Rep. 38, 40 (1989). As untenable as I think the reviewing board's interpretation was, the presumption that the Legislature was aware of that interpretation forces me to interpret the ambiguous cross-

reference in G. L. c. 152, § 1 (1), as endorsing the reviewing board's approach. I therefore must concur in the interpretation announced today, however problematic it may be.

The calculation of an injured employee's workers' compensation benefits is based on the worker's "average weekly wages," which is defined in G. L. c. 152, § 1 (1), as the employee's "earnings" during the year prior to the injury divided by fifty-two (with appropriate adjustments for employees who were employed for less than fifty-two weeks during that preceding year). According to long-standing interpretation by both the reviewing board and the courts, an employee's average weekly wages did not include any amount reflecting the value of fringe benefits that were part of the worker's total compensation package; the average weekly wages were instead based solely on the employee's cash wages. See *Barofsky* v. *Lundermac Co.*, 4 Mass. Workers' Comp. Rep. 135, 142-144 (1990), aff'd, *Borofsky's Case*, 411 Mass. 379 (1991) (computing average weekly wage on "actual money wages paid to an employee" was "tried and true formula" from inception of workers' compensation system; health insurance benefits therefore not part of average weekly wages). This interpretation reflected the fundamental purpose of workers' compensation, which was to provide partial replacement of the cash income on which the employee had come to rely. See *McDonough's Case*, 440 Mass. 603, 604 (2003), and cases cited; L. Locke, Workers' Compensation 1-11, 18-22 (L.Y. Nason, C.W. Koziol, & R. Wall Supp. 2003). Protecting the injured worker from the sudden loss of that cash income, on which the worker's ability to provide for the daily needs of himself and his family depends, is the goal of the workers' compensation scheme. The payment of cash benefits to replace (in part) the lost cash wages was not intended to address other noncash fringe benefits that were often both future and contingent in nature (for example, pension benefits or health benefits).[1] See *Louis's Case*, 424 Mass. 136, 140-141 & n.7 (1997); *Barofsky* v. *Lundermac Co., supra.*

---

[1] In recognition of the fact that some employees receive noncash benefits that provide the employee with certain daily necessities, exceptions have been made for employee benefits that take the place of or reduce the employee's need for cash. See, e.g., *Palomba's Case*, 9 Mass. App. Ct. 881 (1980) (room and board); *Roberts* v. *Central Heating & Cooling*, 9 Mass. Workers' Comp.

In St. 1991, c. 398, § 13, the definition of "average weekly wages" set forth in G. L. c. 152, § 1 (1), was amended to include express reference to the long-standing practice of excluding fringe benefits from the calculation: "[S]uch fringe benefits as health insurance plans, pensions, day care, or education and training programs provided by employers shall not be included in employee earnings for the purpose of calculating average weekly wages under this section." However, that rule was made subject to the exception at issue in this case, namely, that fringe benefits were to be excluded from the calculation "[e]xcept as provided by" G. L. c. 149, §§ 26 and 27. We must therefore look to what is "provided by" those other statutory sections, and, in particular, to what is provided in those sections that would have any relationship to workers' compensation.

Sections 26 and 27 of G. L. c. 149 govern the setting and payment of wages on public works projects constructed by the State, by municipalities, or by public authorities. Under § 26, the Commissioner of the Department of Labor (commissioner) is to determine the "rate or rates of wages" to be paid to workers engaged in the construction of public works. In doing so, the commissioner must take into account, and may not set rates of wages that are less than, wage rates paid to laborers who work in the same municipality, wage rates paid pursuant to collective bargaining agreements in the construction industry, and wage rates paid to employees working in the private construction industry. *Id.* Thus, when the commissioner establishes the wage rates for the various types of work performed on a public construction project, the goal is to make those wage rates comparable to what is being earned by employees performing similar jobs in other parts of the construction industry. See *Felix A. Marino Co.* v. *Commissioner of Labor & Indus.*, 426 Mass. 458, 464-465 (1998).

---

Rep. 431, 435 (1995) (company car provided to employee in lieu of wage increase). See also *Louis's Case*, 424 Mass. 136, 140-141 (1997) (partial disability payments for prior injury included in average weekly wages because they operated "as a direct substitute for such wages"). These exceptions are still premised on the principle that workers' compensation is designed to protect an injured employee from the interruption of his customary cash income, and merely acknowledge those instances where an employer has provided the employee with a necessary item for which most persons would have to pay with cash.

To achieve that parity, § 26 further provides that in calculating the rates of wages for a public works project, the commissioner must include "[p]ayments by employers to health and welfare plans, pension plans and supplementary unemployment benefit plans under collective bargaining agreements or understandings between organized labor and employers." In other words, to establish comparable rates, the commissioner is to consider the entire compensation package, which, under collective bargaining agreements, often includes valuable fringe benefits in addition to hourly cash wages. Failure to consider those other components in the total package would produce obvious disparity, and merely making the hourly pay rates identical would not provide the comparable level of compensation that § 26 seeks to achieve.

Section 27 then provides that the commissioner's determination of the wage rates for the various classifications of jobs on a project be set forth in a "schedule of such rate or rates of wages." That schedule is then included as part of the advertisement or solicitation of bids and becomes part of any contract that is ultimately awarded. *Id.* The rates of wages in the schedule, consistent with the method by which the rates are to be determined under § 26, "shall include payments by employers to health and welfare plans, pension plans and supplementary unemployment benefit plans as provided in [§ 26]." G. L. c. 149, § 27. For the duration of the project, the employer must pay the wage rates set by the commissioner and included in the contract. Where those rates have included amounts paid for benefit packages, an employer may satisfy that part of the required "rate" either by making payment to and providing the employee with the benefit plan *or* by "pay[ing] the amount of said payments directly to each employee." *Id.* In other words, while benefit plans may have been included in the calculation of the "rate of wages" for a particular job, that benefits component of the rate may be provided either in the form of benefits or in the form of cash.

In practical terms, collective bargaining agreements commonly provide for various employee benefit packages, and unionized workers on public works projects will receive the benefits portion of the determined "rate of wages" in the form

of their customary fringe benefits. If, however, there are nonunion workers on the same job site who are not covered by a collective bargaining agreement and therefore not entitled to any fringe benefits as a matter of contract, those workers must still receive the benefits component of the "rate of wages," but they receive that component in the form of cash above and beyond their hourly wages. This has the effect of providing all workers with comparable total compensation, whatever form it takes, and, in particular, ensures that employers have no financial incentive to hire nonunion labor as opposed to union workers. The fringe benefit packages required by collective bargaining agreements are not an expense that can be avoided by hiring nonunion employees, as the exact same amount of money will have to be paid — it will simply be paid directly in cash to the employee instead of being paid to include the employee in a benefit program. Section 27 thus creates, at least potentially, a group of public construction employees who receive fringe benefits in the form of regular cash payments in addition to their normal hourly pay.

When G. L. c. 152, § 1 (1), provides that, "[e]xcept as provided by [G. L. c. 149, §§ 26 and 27]," fringe benefits shall not be included in the calculation of an injured worker's average weekly wages for purposes of workers' compensation benefits, what of the many things that are "provided by" §§ 26 and 27 form the basis of that exception? The insurer in the present case contends that the exception refers to those provisions in §§ 26 and 27 that provide for fringe benefits to be paid in the form of cash, i.e., to those nonunion workers who are receiving the fringe benefit component of the required wage rate as regular cash payments.

The insurer's interpretation would be consistent with the long-standing principle that workers' compensation is intended as a partial replacement of the cash income that a worker is accustomed to receiving and on which he has become dependent for his daily needs. See *McDonough's Case*, 440 Mass. 603, 604 (2003), and cases cited. A worker who has been receiving the fringe benefit component of the required wage rate as a cash payment has become accustomed to receiving that amount and has come to rely on it, and the sudden loss of that cash income

inflicts the precise harm that workers' compensation is intended to ameliorate. Nothing has required such a worker to use that cash to purchase the equivalent of the actual benefit plan that led to its inclusion in the wage rate; he has received the benefit in the form of cash, and has been free to use it as such, indistinguishable from the cash that he receives as part of his hourly wage. Treating it, for workers' compensation purposes, the same as ordinary weekly wages serves the goal of the workers' compensation system, and failure to include that amount in that worker's average weekly wages would result in the worker receiving far less than the percentage of cash income that workers' compensation is designed to replace. This proposed interpretation thus fits squarely within the concepts and purposes underlying the workers' compensation system, and thereby represents a plausible and sensible reading of the exception set forth in G. L. c. 152, § 1 (1).

McCarty, however, argues that the exception sweeps more broadly. He contends that because amounts paid toward fringe benefit plans make up part of the "rates of wages" under G. L. c. 149, §§ 26 and 27, they have become part of the "wages" for all workers on public construction projects, and thus part of the "average weekly wages" when computing workers' compensation benefits for any worker injured on a public construction project. Looking solely at the language used, that would also be a possible interpretation of the cross-reference set forth in G. L. c. 152, § 1 (1), but it is not the only possible interpretation, nor is it compelled by any "plain language." The mere use of the word "wages" in the term "rate of wages" in §§ 26 and 27 does not mean that every component of that "rate of wages" has itself become an employee's "wages." For example, the amount McCarty's employer paid toward his various benefit packages was not reflected as part of his "wages" for purposes of income tax, nor was it included as "wages" for purposes of determining the amount of his union dues. McCarty wishes for these payments to benefit programs to be part of his "wages" for purposes of workers' compensation, but he does not treat them as "wages" if he would have to pay higher taxes or higher union dues as a result. While claiming that the "plain language" of §§ 26 and 27 automatically makes his fringe

benefit packages part of his "wages," McCarty does not in fact embrace that ostensibly plain language unless it suits his purposes.

Thus, McCarty's proposed interpretation is, at least at first blush, a plausible but not an inexorable interpretation, and we should consider whether that interpretation, as opposed to the insurer's at least equably plausible interpretation, is the one that the Legislature more likely intended. There are several reasons suggesting that McCarty's interpretation would not have been intended by the Legislature. To begin with, there is no reason why a system that is designed as a cash replacement system, and that has long excluded fringe benefits from that system, would suddenly include them for workers who happen to receive their fringe benefit package while working on a public construction project. There is nothing about public construction, as opposed to any other form of construction work (or any other form of employment, for that matter), that would make it necessary or appropriate to increase workers' compensation benefits in a manner that went beyond the replacement of lost cash income. While the insurer's proposed interpretation is consistent with the underlying purpose of workers' compensation, McCarty's is not.

McCarty's interpretation also produces anomalous results, including some that are antithetical to the principles underlying workers' compensation. The amounts paid toward fringe benefit plans under collective bargaining agreements are substantial, and their inclusion in a worker's average weekly wages would result in a dramatic increase in the amounts to be paid to such workers. Indeed, in the present case, the addition of the fringe benefits to McCarty's average weekly wages increases them from $876.06 to $1,209.57. In cases of temporary total disability, benefits are set at sixty per cent of the average weekly wages. G. L. c. 152, § 34. Applied to the $876.06 amount that McCarty was accustomed to receiving as cash, that would translate to total disability benefits of $525.64 a week. If his average weekly wages are inflated by the amount that his employer paid to maintain the various benefit programs, sixty per cent of those average weekly wages would equate to $725.74. However, § 34 sets a cap on the total benefits that

may be paid, based on the Statewide average weekly wage at the time of injury. See G. L. c. 152, § 1 (10) (defining "[m]aximum weekly compensation rate" as "one hundred per cent of the average weekly wage in the commonwealth" as determined by division of employment and training). In McCarty's case, that statutory cap is $585.66. As illustrated by the present case, the inclusion of fringe benefits in the calculation will push the benefits amounts to well above the statutory cap, meaning that essentially every worker injured on a public works project will receive the absolute maximum amount of workers' compensation benefits allowable — the precise statutory cap. This in turn translates to higher — and indeed to maximum — workers' compensation premiums on workers' compensation insurance covering public works projects. Given that one of the objectives of the 1991 legislation that created the exception at issue here was to reduce the cost of workers' compensation, see *Taylor's Case*, 44 Mass. App. Ct. 495, 500-501 (1998), it is odd to interpret its provisions in a way that would increase workers' compensation costs on all public works projects to the absolute maximum.

Inclusion of the amounts paid to fringe benefit plans produces even more anomalous results in the calculation of partial disability benefits under G. L. c. 152, § 35. The dramatic inflation of the average weekly wage skews the computation determining when a partially disabled worker's earning capacity will begin to offset the amount received in workers' compensation benefits. Indeed, the inflation can skew the computation so badly that a partially disabled worker can receive workers' compensation benefits and earnings from part-time employment that total *more* than the worker was earning when working full time prior to his injury. Given that workers' compensation is intended to replace only *part* of the cash income that the worker has lost due to injury, it is antithetical to that concept to have a system that pays a worker *more* for remaining on workers' compensation benefits than he would earn by returning to full-time employment. It also creates a powerful disincentive to return to full-time work. Not only is this result contrary to the purposes of workers' compensation and to any rational view of how its incentives should operate, it is also contrary to another stated

purpose of the 1991 legislation. The 1991 legislation was designed to "bring workers back to the workforce," State House News Service (House Sess.), Dec. 19, 1991, at 13-14, to "encourage[] and ultimately require[] employees who can return to work to do so," and to "root out fraud and other abuses of the system." May 14, 1991, Letter from Governor William F. Weld to the Senate and House of Representatives, 1991 House Doc. No. 5609. An interpretation that makes it more advantageous for employees to collect workers' compensation benefits than to return to full-time employment is inimical to these stated objectives and indeed defies common sense.

Of course, an interpretation that yields anomalous results, or even seemingly absurd results, may nevertheless be explained if that interpretation would serve some countervailing purpose that the Legislature may have intended. However, one searches in vain for any reason why the Legislature would have so distorted the workers' compensation system merely because the injured worker was injured on a public construction project as opposed to some other type of job. Today's opinion identifies no rationale for the interpretation it announces, and it does not even address — let alone identify any explanation or justification for — the anomalous results that flow from that interpretation. Instead, by means of a footnote stating that the court has "considered, but need not address, every argument" raised by the insurer, *ante* at 364 n.4, it ignores the numerous examples, compellingly calculated and detailed in the insurer's brief, illustrating how McCarty's interpretation would contort and undermine the workers' compensation system.

McCarty does not dispute any of the insurer's calculations concerning the impact that inclusion of fringe benefits would have on the amount of workers' compensation benefits to be paid uniquely to union workers on public construction projects. Instead, he seeks to articulate a rationale for that inclusion by claiming that it is necessary in order to achieve parity between union workers and nonunion workers on the same project. Because nonunion workers receive those inflated amounts as part of their workers' compensation, McCarty contends, union workers should receive the same amounts of workers' compensation. This proposed rationale is a non sequitur. Section

27 does not require that union workers and nonunion workers be treated the same with respect to how and in what form they are compensated. To the contrary, it specifies different treatment. Nonunion workers, who do not receive actual fringe benefits, instead receive a higher amount of cash in their weekly paychecks than do union workers who receive fringe benefits as actual benefits. Workers' compensation, a cash replacement system, does not pay the same amount of workers' compensation to injured workers who, prior to their injuries, received differing amounts of cash. McCarty's claim of a desire for parity is the equivalent of saying that all employees should receive the same amount of workers' compensation benefits, without regard to differences in the dollar amount they earned prior to their injury. The workers' compensation system does not pay some fixed amount to each and every injured worker, but is instead calculated — down to the penny — based on the exact dollar amount that the worker was earning.

The parity argument also ignores the fact that the parity promoted by G. L. c. 149, §§ 26 and 27, is between workers on public construction projects and workers in the rest of the construction industry. The commissioner is to look at the compensation paid, either as wages or as fringe benefits, to workers doing comparable construction work elsewhere, and to set the rates of wages accordingly. G. L. c. 149, § 26. Of course, workers on all other types of construction projects who receive fringe benefits as part of their regular compensation do not get those benefits included as part of the calculation of their workers' compensation payments. Sections 26 and 27 are designed to compensate construction workers on public works projects the same as construction workers on other projects, not to give workers on public works projects higher benefits than benefits paid to workers on other types of projects.

Finally, even if there were any merit to McCarty's claim that higher workers' compensation payments for union workers on public construction projects are justified so that they may receive the same amount of workers' compensation as nonunion workers who received their fringe benefits in the form of cash, that justification evaporates where, as here, there are no such nonunion workers on the project. Indeed, the evident purpose

behind the requirement that nonunion workers receive fringe benefits as cash payments is to remove any financial incentive to hire such nonunion workers and to encourage contractors on public works projects to hire union labor instead. Moreover, it is not uncommon that the authorization for a major public works project (such as the so-called "Big Dig" project on which Mc-Carty worked) include the express requirement that only union labor be used. See, e.g., *Modern Continental/Obayashi* v. *Massachusetts Comm'n Against Discrimination, ante* 96, 98 (2005) (describing required project labor agreement mandating that only union workers be hired on "Big Dig" project). Here, there are no nonunion workers with whose workers' compensation payments McCarty must ostensibly keep pace. All of the workers at his site were covered by collective bargaining agreements providing fringe benefits; no one on the site was receiving a cash payment as the fringe benefit component of the set wage rates, and no one was eligible to receive a higher workers' compensation payment predicated on such a cash payment. Mc-Carty's argument for increased workers' compensation benefits in order to maintain parity asks for parity with workers who do not exist, either at his worksite or at many other public construction sites. This is hardly an explanation why the Legislature might have intended the anomalous results that would flow from McCarty's proposed reading of the statutes.

In short, if I were to look at the language of the statutes involved, their underlying purposes, the stated purposes of the 1991 legislation, and long-standing principles governing workers' compensation, I would conclude that the insurer's proposed interpretation is by far the more sound. It recognizes that G. L. c. 149, §§ 26 and 27, can create a category of workers on some public construction projects who receive the fringe benefit component of their required wage rate as actual cash and that, under a workers' compensation system designed to replace lost cash income, the workers' compensation benefits paid to those workers must take into account the total amount of cash that they were accustomed to receiving, despite the fact that some of that cash bore the label of a fringe benefit. This is a sensible harmonizing of the two statutory schemes that accords with the purposes underlying both and that produces results consistent

with both. By contrast, McCarty's proposed interpretation bears no relation to the purposes underlying either statutory scheme, produces results that are contrary to the purposes of both schemes and to the stated purposes of the 1991 legislation, and is unsupported by any countervailing purpose that might have prompted the Legislature to deviate from those underlying and expressly stated purposes. I cannot accept the proposition that McCarty's interpretation simply flows from the "plain" or "clear and unambiguous" language of G. L. c. 152, § 1 (1), and G. L. c. 149, §§ 26 and 27. *Ante* at 361, 364, 365, 367, 368.

I am, however, forced to accept the interpretation announced today because, prior to the 1991 legislation, the reviewing board had interpreted G. L. c. 149, §§ 26 and 27, to require that amounts paid toward benefit plans be included in a public construction worker's average weekly wage for purposes of workers' compensation. See *Lyons* v. *Fontaine Bros.*, 4 Mass. Workers' Comp. Rep. 398, 399 (1990); *Machado* v. *Joseph B. Fay Co.*, 3 Mass. Workers' Comp. Rep. 38, 40 (1989). When interpreting a statute, we presume that the Legislature was aware of any relevant court and agency decisions, see *Kszepka's Case*, 408 Mass. 843, 847 (1990), and we must employ that presumption even where the legislative history contains no specific indication of the Legislature's awareness of any particular decision.[2] In this case, we must therefore presume, whether it is true or not, that the Legislature enacted the exception to the definition of average weekly wages set forth in G. L. c. 152, § 1 (1), with full awareness that the reviewing board had already interpreted G. L. c. 149, §§ 26 and 27, in a manner that included fringe benefits in the calculation of a public construction worker's average weekly wages, and that the reviewing board had done so for union workers on public construction projects who received their fringe benefits as actual fringe benefits and not as cash. Assuming such an awareness, the wording of the exception enacted in 1991 must be treated as a ratification of the reviewing board's interpretation. If the Legislature had intended to repudiate the reviewing board's

---

[2]McCarty's brief cites no legislative history suggesting that the Legislature was actually aware of the agency's prior interpretation of G. L. c. 149, §§ 26 and 27, at the time of the 1991 legislation.

interpretation, the wording of the exception would have done so explicitly. The wording of the exception as enacted, however, is not explicit — standing alone, it could comport with either the reviewing board's interpretation or with the insurer's proposed interpretation. Resolution of the ambiguous wording of the exception must honor the presumption of the Legislature's awareness of the reviewing board's prior interpretation, and that presumption forces me to conclude that the Legislature accepted and adopted the reviewing board's interpretation.

Here, as in many cases involving statutory construction, we do not know whether the presumption reflects reality. However, agency and court decisions are available to the Legislature when they are considering legislation in an area to which those agency and court decisions pertain, and we presume that, as part of familiarizing themselves with the subject matter of the legislation, legislators became familiar with that pertinent precedent. We must apply that presumption here, even when, in my view, it results in an interpretation that seems very much at odds with the over-all purposes of the underlying statutes and with the specific purposes of the legislation in question. If in fact the Legislature was not aware of the reviewing board's prior interpretation at the time it enacted the exception to G. L. c. 152, § 1 (1), or if in fact the Legislature did not intend to endorse that interpretation, it is up to the Legislature to correct the interpretation that we have been required to adopt. Meanwhile, this court must apply the canons of statutory construction, even if we have grave doubts about the soundness of the interpretation that results from the application of those canons. In my view, the interpretation announced today is notably unsound in many respects, but the canons of statutory construction force me to accept it.