NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-13366

CHAD MARSH  vs.  MASSACHUSETTS COASTAL RAILROAD LLC & another.[1]

Plymouth.     April 5, 2023. – August 14, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt, & Georges, JJ.

Massachusetts Wage Act.  Public Works, Wage determination. Federal Preemption.  Labor, Public works, Wages.  Railroad. Statute, Construction, Federal preemption.  Practice, Civil, Motion to dismiss.

Civil action commenced in the Superior Court Department on July 23, 2021.

A motion to dismiss was heard by Brian S. Glenny, J., and a motion for reconsideration was considered by him.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

Alvin S. Nathanson (Conner P. Lang also present) for the defendants.
Raven Moeslinger for the plaintiff.
Sarah G. Yurasko, of the District of Columbia, & William D. Black, for American Short Line and Regional Railroad Association, amicus curiae, submitted a brief.

---

[1] P. Chris Podgurski.

WENDLANDT, J.  The Prevailing Wage Act, G. L. c. 149, §§ 26-27H (Prevailing Wage Act, or Act), evinces the Legislature's intent that laborers performing work in the Commonwealth on the Commonwealth's public works projects are paid a fair wage as determined by the Commonwealth based on prevailing market conditions (prevailing wage).  The Act is designed to avoid rewarding a contractor that submits an artificially low bid on public works projects by paying its employees less than the prevailing wage.  It embodies the Commonwealth's policy to dedicate public funds to the payment of wages consistent with market conditions to employees on public works projects.

In the present case, the plaintiff, Chad Marsh, alleges that the defendant Massachusetts Coastal Railroad LLC (MCR) paid him less than the prevailing wage on State public works projects, including a project to restore commuter rail service between Boston and southeastern Massachusetts (South Coast Rail project).  On appeal from the denial of their motion to dismiss, MCR, a railroad company, and its managing officer, the defendant P. Chris Podgurski, contend that the Interstate Commerce Commission Termination Act, 49 U.S.C. § 10501 (ICCTA), which provides that the remedies set forth in the ICCTA "with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State Law," 49 U.S.C.

§ 10501(b), preempts the Prevailing Wage Act.  As a result, they assert that the Commonwealth is precluded from enforcing the Act to ensure that laborers engaged in public works projects are paid a prevailing wage by the Commonwealth's contractors where the contractor that wins the bid for a contract is a railroad company.

Because the defendants' argument is unsupported by the plain language of the ICCTA, and because the argument runs counter to the long-established principle that, in the absence of a clear expression otherwise, we must presume that Congress did not intend to preempt a State's exercise of its historic police powers, we conclude that the defendants have failed to show that the Prevailing Wage Act is preempted.  Further concluding that the defendants also have not shown that the Act is preempted under either the field or conflict preemption doctrines and that, at this stage of the litigation, Marsh's allegation that he performed qualifying work on a public works project covered by the Prevailing Wage Act plausibly suggests a right to relief under the Act, we affirm.[2]

1.  Background.  "We recite the facts asserted in the amended complaint, taking them as true for purposes of

---

[2] We acknowledge the amicus brief submitted by the American Short Line and Regional Railroad Association.

evaluating the motion to dismiss."  Edwards v. Commonwealth, 477 Mass. 254, 255 (2017).

a.  Complaint's allegations.  MCR is "a railroad company specializing in integrated rail freight and logistics services that completes public works projects throughout Massachusetts." Podgurski is "an officer or agent having the management of MCR," who "participated to a substantial [degree] in formulating the policies of the company."  In June 2019, MCR hired Marsh as an equipment operator.

During Marsh's employment, MCR entered into contracts with the Commonwealth to complete "integrated rail freight and logistics projects," including the South Coast Rail project, the purpose of which was to "restore commuter rail service between Boston and southeastern Massachusetts"; Marsh alleges that "these projects constituted public works projects and/or public works to be constructed within the meaning of . . . G. L. c. 149, §§ 27, 27F."  In connection with these projects, Marsh operated certain construction vehicles and equipment.[3]  He was paid an hourly rate that was less than the applicable prevailing wage rate for his work.  In June 2021, Marsh resigned.

---

[3] Marsh operated boom trucks, backhoes, and loaders to unload materials on site.  He also used a backhoe to dig, and he used a tamper to tamp stone to lift and level railway tracks. In operating the equipment, Marsh made "additions and/or alterations to public property and/or public works."

b.  Procedural history.  Marsh commenced the present action against the defendants, seeking relief related to MCR's failure to pay him the prevailing wage for his work on public works projects.  In particular, he alleges that he was entitled to a prevailing wage as an operator of vehicles and equipment engaged in public works projects, under G. L. c. 149, § 27F,[4] and as a laborer performing a construction job on public works projects, under G. L. c. 149, § 27.[5]  He contends that the defendants

_____

[4] General Laws c. 149, § 27F, provides that

"[n]o agreement of lease, rental or other arrangement, and no order or requisition under which a truck or any automotive or other vehicle or equipment is to be engaged in public works by the [C]ommonwealth . . . shall be entered into or given by any public official or public body unless said agreement, order or requisition contains a stipulation requiring prescribed rates of wages, as determined by the commissioner [of the Department of Labor Standards (DLS), see G. L. c. 149, § 1], to be paid to the operators of said trucks, vehicles or equipment" (emphasis added).

The § 27F claim was brought only against MCR.

[5] General Laws c. 149, § 27, provides that

"[p]rior to awarding a contract for the construction of public works, [a] public official or public body shall submit to the commissioner [of DLS] a list of the jobs upon which . . . laborers are to be employed, and shall request the commissioner to determine the rate of wages to be paid on each job."

Contractors engaged by the Commonwealth to perform work on public works construction projects must "annually obtain updated rates from the public official or public body[,] and no contractor or subcontractor shall pay less than the rates so established" (emphasis added).  Id.  "Whoever shall pay less

violated these provisions of the Prevailing Wage Act by failing to pay him the prevailing wage for his work,[6] and further violated the Fair Minimum Wage Act, G. L. c. 151, §§ 1A, 1B,[7] by failing to use the prevailing wage as the basis for calculating his overtime wages.  He also alleges that, because he was not paid the full amount due for each pay period during which he should have been paid the prevailing wage, the defendants violated the requirement of the Wage Act, G. L. c. 149, § 148,[8]

than said rate or rates of wages . . . on said works . . . shall have violated this section and shall be punished or shall be subject to a civil citation or order."  Id.

   [6] General Laws c. 149, § 27F, provides a private right of action for "for any damages incurred, and for any lost wages and other benefits" to operators of "equipment . . . engaged in public works by the [C]ommonwealth" who "claim[] to be aggrieved" by violations of the Prevailing Wage Act; G. L. c. 149, § 27, affords the same private right of action to laborers on public works.

   [7] General Laws c. 151, § 1A, provides that, aside from certain exceptions,

   "no employer in the [C]ommonwealth shall employ any of his employees in any occupation . . . for a work week longer than forty hours, unless such employee receives compensation for his employment in excess of forty hours at a rate not less than one and one half times the regular rate at which he is employed" (emphasis added).

General Laws c. 151, § 1B, provides a private right of action for employees who are paid less than the overtime rate of compensation.

   [8] The Wage Act provides, in relevant part, that

   "[e]very person having employees in his service shall pay weekly or bi-weekly each such employee the wages earned by

that he receive earned wages timely.[9]  Finally, Marsh alleges

that, following his resignation, MCR failed to pay him timely

for his accrued paid time off and approximately eight hours of

work.  When he received both payments, he was not compensated

fully by the tardy payments.[10]

The defendants filed a motion to dismiss on the basis that

Marsh's claims, which depend on the applicability of the

Prevailing Wage Act, failed because the Prevailing Wage Act was

preempted.  Alternatively, the defendants maintained that

dismissal was warranted because MCR's contracts with the

Commonwealth did not involve "public works" projects governed by

---

> him to within six days of the termination of the pay period during which the wages were earned if employed for five or six days in a calendar week . . . but any employee leaving his employment shall be paid in full on the following regular pay day, and, in the absence of a regular pay day, on the following Saturday" (emphasis added).

G. L. c. 149, § 148, first par.  It further provides that "[t]he word 'wages' shall include any holiday or vacation payments due an employee under an oral or written agreement."  Id.

[9] The defendants do not address, nor do we reach, the issue whether recovery under the Wage Act is permissible under the circumstances alleged in the complaint.  See Donis v. American Waste Servs., LLC, 485 Mass. 257, 269 (2020) ("Where . . . the sole basis for [the employees'] claim is a violation of the Prevailing Wage Act, the [employees] may not restate their claims under the Wage Act to evade the limitations of the Prevailing Wage Act on the scope of potentially liable defendants").

[10] See Reuter v. Methuen, 489 Mass. 465, 466 (2022) (employer is responsible for trebled amount of late wages under Wage Act).

the Prevailing Wage Act.  In a thorough and thoughtful decision, the Superior Court judge denied the motion, as well as the defendants' subsequent motion for reconsideration.  The defendants filed a notice of appeal from the denial of both motions, and we transferred the case to this court on our own motion.

2.  Discussion.  a.  Standard of review.  "We review the denial of a motion to dismiss under Mass. R. Civ. P. 12 (b) (6)[, 365 Mass. 754 (1974),] de novo."  Dunn v. Genzyme Corp., 486 Mass. 713, 717 (2021).[11]  In doing so, we accept "as true all well-pleaded facts alleged in the complaint, drawing all reasonable inferences therefrom in the plaintiff's favor, and determining whether the allegations plausibly suggest that the plaintiff is entitled to relief."  Lanier v. President & Fellows of Harvard College, 490 Mass. 37, 43 (2022).

---

[11] Orders denying a motion to dismiss "generally are not appealable until the ultimate disposition of the case because they are not 'final orders.'"  Brum v. Dartmouth, 428 Mass. 684, 687 (1999).  The present appeal raises "a significant issue" concerning the Prevailing Wage Act, which "has been briefed fully by the parties," and "addressing it would be in the public interest."  Marcus v. Newton, 462 Mass. 148, 153 (2012).  Cf. Witty v. Delta Air Lines, Inc., 366 F.3d 380, 382 (5th Cir. 2004) (allowing interlocutory review of preemption issue).  The defendants maintain that interlocutory review is appropriate, and Marsh does not disagree.  Accordingly, we exercise our discretion to reach the merits of the parties' arguments.  See, e.g., Dunn, 486 Mass. at 717 (granting application for interlocutory review of denied motion to dismiss raising preemption issue).

b.   Prevailing Wage Act framework.   The Prevailing Wage Act is a general law[12] "that concerns a subject of traditional State regulation."  Felix A. Marino Co. v. Commissioner of Labor & Indus., 426 Mass. 458, 463 (1998).  It "govern[s] the setting and payment of wages on [certain] public works projects."  Donis v. American Waste Servs., LLC, 485 Mass. 257, 263 (2020), quoting McCarty's Case, 445 Mass. 361, 370 (2005) (Sosman, J., concurring).  It was enacted "to achieve parity between the wages of workers engaged in public construction projects and workers in the rest of the construction industry."  Donis, supra, quoting Mullally v. Waste Mgt. of Mass., Inc., 452 Mass. 526, 532 (2008).

The prevailing wage schedule, which lists the prevailing wage for each job category on a public works project, is determined by the commissioner of the Department of Labor Standards (DLS), based on wages paid for similar work on the market.  McCarty's Case, 445 Mass. at 370 (Sosman, J., concurring), citing G. L. c. 149, § 26 (in determining schedule, "the commissioner must take into account, and may not set rates of wages that are less than, wage rates paid to laborers who

_____

[12] See Black's Law Dictionary 1057 (11th ed. 2019) (defining "general law" as a "[l]aw that is neither local nor confined in application to particular persons" that "purports to apply to all persons or places of a specified class throughout the jurisdiction").

work in the same municipality, wage rates paid pursuant to collective bargaining agreements in the construction industry, and wage rates paid to employees working in the private construction industry").  The commissioner's "goal is to make [the prevailing] wage rates comparable to what is being earned by employees performing similar jobs in other parts of the construction industry."[13]  McCarty's Case, supra.

Pursuant to the Act, a contractor bidding on a public works project is expected to use the prevailing wage rates set forth in the Commonwealth's prevailing wage schedule to calculate the labor costs included in its proposed bid.  G. L. c. 149, § 27 (requiring public officials to incorporate schedule of prevailing wage rates in each request for proposals for each public works project).  If selected to perform work on a public works project, the contractor must pay, at the least, the

---

[13] "To achieve that parity, [the Act] further provides that in calculating the rates of wages for a public works project, the commissioner must include [not only the hourly wages, but also] '[p]ayments by employers to health and welfare plans, pension plans and supplementary unemployment benefit plans under collective bargaining agreements or understandings between organized labor and employers.'"  McCarty's Case, 445 Mass. at 371 (Sosman, J., concurring), quoting G. L. c. 149, § 26.  "In other words, to establish comparable rates, the commissioner is to consider the entire compensation package, which, under collective bargaining agreements, often includes valuable fringe benefits in addition to hourly cash wages.  Failure to consider those other components in the total package would produce obvious disparity, and merely making the hourly pay rates identical would not provide the comparable level of compensation that § 26 seeks to achieve."  McCarty's Case, supra.

prevailing wage to its laborers on the project for the duration of the contract with the Commonwealth. Id. (requiring that prevailing wage schedule "be made a part of the contract for said [public] works [projects] and shall continue to be the minimum rate or rates of wages for said employees during the life of the contract").[14]

The Prevailing Wage Act "prevents a contractor from 'offer[ing] its services [to the Commonwealth] for less than what is customarily charged by its competitors for nonpublic works contracts,'" Donis, 485 Mass. at 263-264, quoting Mullally, 452 Mass. at 533, and further "protects an employee's interest in receiving a wage commensurate with his or her labor," Donis, supra at 263. It "has the effect of providing all workers with comparable total compensation [to that which laborers receive on nonpublic works projects], whatever form it takes, and, in particular, ensures that employers have no financial incentive to hire nonunion labor as opposed to union

---

[14] "Where th[e prevailing wage] rates have included amounts paid for benefit packages, an employer may satisfy that part of the required 'rate' either by making payment to and providing the employee with the benefit plan or by 'pay[ing] the amount of said payments directly to each employee.'" McCarty's Case, 445 Mass. at 371 (Sosman, J., concurring), quoting G. L. c. 149, § 27. Thus, the "benefits component of the [prevailing wage] rate may be provided either in the form of benefits or in the form of cash." McCarty's Case, supra.

workers."  McCarty's Case, 445 Mass. at 372 (Sosman, J.,
concurring).[15]

The Act embodies the Legislature's policy to govern how the
Commonwealth itself will exercise its responsibility to ensure
that employees working on a public works project are not
underpaid as a result of the competitive forces present in
public bidding contests.  See Donis, 485 Mass. at 263-264.  In
other words, it represents the Commonwealth's decision, through
its contracts, to dedicate public funds to the payment of wages
consistent with market conditions to employees on public works
projects.[16]  See id. at 262 ("For each kind of project to which
it applies, the Prevailing Wage Act provides a mechanism for
setting and enforcing minimum wage rates").

c.  Preemption.  With this background in mind, we turn to
consider the defendants' preemption arguments.  State law is

---

[15] "The fringe benefit packages required by collective
bargaining agreements are not an expense that can be avoided by
hiring nonunion employees, as the exact same amount of money
will have to be paid -- it will simply be paid directly in cash
to the employee instead of being paid to include the employee in
a benefit program."  McCarty's Case, 445 Mass. at 372 (Sosman,
J., concurring).

[16] Accord Friends of the Eel River v. North Coast R.R.
Auth., 3 Cal. 5th 677, 723 (2017) (environmental standards for
State projects, including rail transportation projects,
"embod[y] a [S]tate policy adopted by the Legislature to govern
how the [S]tate itself and the [S]tate's own subdivisions will
exercise their responsibilities").

preempted[17] by Federal law when (1) the preemptive intent is stated explicitly in the Federal law's language or implicitly contained in its structure and purpose (express preemption), (2) the Federal law so thoroughly occupies a legislative field such that it is reasonable to infer that Congress left no room for the State to supplement it (field preemption), or (3) the State law actually conflicts with the Federal law (conflict preemption).[18]  See Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992); Patel v. 7-Eleven, Inc., 489 Mass. 356, 366 n.15 (2022), citing English v. General Elec. Co., 496 U.S. 72, 78-79 (1990).  The "ultimate touchstone" of preemption analysis is congressional intent, which is discerned primarily from the language of the preemption statute and its framework. Medtronic, Inc. v. Lohr, 518 U.S. 470, 485-486 (1996).

Importantly, our preemption analysis is rooted in "the assumption that the historic police powers of the States [are]

---

[17] The doctrine of preemption is rooted in the supremacy clause of the United States Constitution, which provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . , shall be the supreme Law of the Land."  U.S. Const., art. VI, cl. 2.

[18] Conflict preemption occurs when "it is 'impossible for a private party to comply with both [S]tate and [F]ederal requirements,' . . . or where [S]tate law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  Sprietsma v. Mercury Marine, 537 U.S. 51, 64-65 (2002), quoting Freightliner Corp. v. Myrick, 514 U.S. 280, 287 (1995).

not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress."  Dunn, 486 Mass. at 718, quoting Cipollone, 505 U.S. at 516.  The assumption is "particularly strong [in the present context] given [S]tates' lengthy history of regulating employees' wages and hours" (citation omitted).  Devaney v. Zucchini Gold, LLC, 489 Mass. 514, 519 (2022).  See Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 756 (1985), quoting DeCanas v. Bica, 424 U.S. 351, 356 (1976), superseded by statute as recognized in Kansas v. Garcia, 140 S. Ct. 791 (2020) ("States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State," including through State laws related to minimum and other wages).

Recognizing that prevailing wage laws are a powerful mechanism for States, as market participants, to direct public policy on their own public works projects by controlling how to spend public funds to achieve the States' policy objectives, see, e.g., California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc., 519 U.S. 316, 332 (1997) (State prevailing wage law provided incentive to utilize employee apprenticeship programs on public works projects), and that such laws fall within the "historic police powers of the States," id. at 331, quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218,

230 (1947), the United States Supreme Court has expressed reluctance to find a congressional intent to preempt such laws even where Federal legislation includes a broad preemption provision. See, e.g., Dillingham Constr., N.A., Inc., supra at 334 (rejecting argument that State's prevailing wage law was preempted by broad preemption clause of Federal Employee Retirement Income Security Act [ERISA], which expansively preempted all State laws that have "connection with" or "relate to" employee benefit plans, absent clearer indication of congressional intent to usurp State's public works policy). Instead, the Supreme Court has viewed with skepticism any argument that Congress intended "to trench on the States' arrangements for conducting their own governments," construing Federal legislation "in a way that preserves a State's chosen disposition of its own power, in the absence of [a] plain statement [indicating that Congress intended to preempt the State law]." Nixon v. Missouri Mun. League, 541 U.S. 125, 140 (2004). See, e.g., id. at 128-129 (Federal Telecommunications Act "preempt[ing] . . . [S]tate and local laws and regulations expressly or effectively 'prohibiting the ability of any entity' to provide telecommunications services" did not preempt State's power to restrict its own delivery of such services [citation omitted]).

Notably, the Prevailing Wage Act is not targeted at the railroad industry or rail transportation, an "area where there has been a history of significant [F]ederal presence."[19] Florida E. Coast Ry. v. West Palm Beach, 266 F.3d 1324, 1328 (11th Cir. 2001), quoting United States v. Locke, 529 U.S. 89, 108 (2000). The Act is a general law that falls within the State's traditional police powers of wage regulation. See Felix A. Marino Co., 426 Mass. at 463. More particularly, it falls within the State's power to direct how it will spend public funds to promote its policy to pay laborers wages that are consistent with market conditions.[20]

Accordingly, "'[t]he principles of federalism and respect for [S]tate sovereignty that underlie the [Supreme] Court's reluctance to find pre-emption,' Cipollone[, 505 U.S. at 533] (Blackmun, J., concurring), place a 'considerable burden' on" the defendants here. Florida E. Coast Ry., 266 F.3d at 1329, quoting De Buono v. NYSA-ILA Med. & Clinical Servs. Fund, 520

---

[19] For a fuller account of the history of Federal railroad legislation, see R.J. Corman R.R./Memphis Line v. Palmore, 999 F.2d 149, 151-152 (6th Cir. 1993).

[20] By contrast, where a State legislates in an area that traditionally has been governed by Federal law and regulations, the presumption against preemption does not apply. See Locke, 529 U.S. at 108 (State regulation of oil tanker design and operation not entitled to presumption against preemption because State purported to regulate maritime commerce, "where there has been a history of significant [F]ederal presence").

U.S. 806, 814 (1997). See, e.g., New York Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 658-664 (1995) (concluding that preemption clause, which preempted State laws that "relate to" employee benefits plans under ERISA, did not preempt State's law imposing surcharges on commercial insurance providers despite indirect economic effect on such plans absent clearer expression of congressional intent).

i. Express preemption. We turn now to the defendants' argument that the Prevailing Wage Act is preempted expressly by the ICCTA. Where, as here, a Federal statute "contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993). See Williams v. Taylor, 529 U.S. 420, 431 (2000) (construction "start[s] . . . with the language of the statute").

The ICCTA vests the Surface Transportation Board (STB) with "exclusive" jurisdiction "over (1) transportation by rail carriers . . . and (2) the construction, acquisition, operation, abandonment, or discontinuance of . . . tracks[] or facilities"

(emphasis added).[21]  49 U.S.C. § 10501(b).  The statute's express preemption clause provides that "the remedies provided under this part <u>with respect to regulation of rail transportation are exclusive and preempt</u> the remedies provided under Federal or State law (emphasis added)."  <u>Id</u>.

In view of the plain language of the ICCTA's preemption clause, Federal courts and the STB[22] have concluded that "Congress narrowly tailored the ICCTA pre-emption provision to displace only 'regulation,' i.e., those [S]tate laws that may reasonably be said to have the effect of 'manag[ing]' or 'govern[ing]' rail transportation."  <u>Florida E. Coast Ry</u>., 266 F.3d at 1331, quoting Black's Law Dictionary 1286 (6th ed.

---

[21] "[T]ransportation" is expansively defined to include, in relevant part, "(A) a . . . vehicle, . . . warehouse, . . . property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and (B) services related to that movement."  49 U.S.C. § 10102(9).

[22] "As the agency authorized by Congress to administer the [ICCTA], the [STB] is 'uniquely qualified to determine whether [S]tate law . . . should be preempted' by the [ICCTA]."  <u>Green Mountain R.R.</u> v. <u>Vermont</u>, 404 F.3d 638, 642-643 (2d Cir. 2005), quoting <u>CSX Transp., Inc</u>. v. <u>Georgia Pub. Serv. Comm'n</u>, 944 F. Supp. 1573, 1584 (N.D. Ga. 1996).  See <u>Wyeth</u> v. <u>Levin</u>, 555 U.S. 555, 576-577 (2009) ("While agencies have no special authority to pronounce on pre-emption absent delegation by Congress, they do have a unique understanding of the statutes they administer and an attendant ability to make informed determinations about how [S]tate requirements may pose an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" [quotation and citation omitted]).

1990).  See <u>Pilot Life Ins. Co. v. Dedeaux</u>, 481 U.S. 41, 50 (1987) ("common-sense view of the word 'regulates' would lead to the conclusion that in order to regulate insurance, a law must not just have an impact on the insurance industry, but must be specifically directed toward that industry"); <u>New York Susquehanna & W. Ry. v. Jackson</u>, 500 F.3d 238, 252 (3d Cir. 2007) ("Because the [ICCTA's] subject matter is limited to deregulation of the railroad industry, . . . courts and the [STB] have rightly held that it does not preempt <u>all</u> [S]tate regulation affecting transportation by rail carrier").  Accord H.R. Rep. No. 104-422, 104th Cong., 1st Sess., at 167 (1995) (ICCTA preemption provision "is limited to remedies with respect to rail regulation -- not State and Federal law generally"); Riverdale -- Petition for Declaratory Order -- New York Susquehanna & W. Ry., 4 S.T.B. 380, 386 (1999) (Riverdale) (Congress did not preempt all State laws that "affect railroads" in any manner whatsoever).  Cf. Horton <u>vs</u>. Kansas City S. Ry., Tex. Sup. Ct., No. 21-0769, slip op. at *10-11 (June 30, 2023) (negligence claim in wrongful death action not preempted by ICCTA even when applied to railroad).

The ICCTA does not preclude State laws that may have a "remote or incidental effect on rail transportation."  <u>Florida E. Coast Ry</u>., 266 F.3d at 1331 (ICCTA's preemption clause tailored toward "regulation of rail transportation," which

"necessarily means something qualitatively different from laws 'with respect to rail transportation'" [emphasis added; citation omitted]).[23]  Specifically, State laws that fall within the State's "general police powers" are not preempted by the ICCTA even when they affect "railroad activity."  Norfolk S. Ry. v. Alexandria, 608 F.3d 150, 158 (4th Cir. 2010).[24]

Thus, although the defendants correctly note that Marsh performed "construction" work on railroad tracks -- an area of work that falls within the ICCTA's exclusive jurisdiction, see 49 U.S.C. § 10501(b) -- it is less clear whether application of the Prevailing Wage Act to define the wages paid to construction workers on public works projects is a preempted "regulation" of

---

[23] See Bennett v. Spear, 520 U.S. 154, 173 (1997) (under "cardinal principle of statutory construction . . . [courts must] give effect, if possible, to every clause and word of a statute" [quotations and citation omitted]).

[24] The defendants' reliance on Bay Colony R.R. v. Yarmouth, 470 Mass. 515, 518-519 (2015), which concerned the broader preemption provision of the Federal Aviation Administration Authorization Act (FAAAA), is misplaced.  See id. at 518, quoting Massachusetts Delivery Ass'n v. Coakley, 769 F.3d 11, 18 (1st Cir. 2014), and Rowe v. New Hampshire Motor Transp. Ass'n, 552 U.S. 364, 370 (2008) (preemptive scope of FAAAA was "purposefully expansive," preempting State laws "having a connection with, or reference to, carrier rates, routes, or services, even if the law's effect on rates, routes, or services [was] only indirect, and irrespective of whether [the] law [was] consistent or inconsistent with [F]ederal regulation" [quotations omitted]).

rail transportation, on the one hand, or a permissible State law with an incidental effect on railroad activities, on the other.[25]

In drawing the line between a local law that is a preempted "regulation" of rail transportation and a State law that is a permissible exercise of State's authority that incidentally affects railroad activities, Federal courts have concluded that "[w]hat matters is the degree to which the challenged [State law] burdens rail transportation."  New York Susquehanna & W. Ry., 500 F.3d at 252.  State laws are permissible if they do not "interfere with or unreasonably burden railroading."  Id.  See King County, WA -- Petition for Declaratory Order -- Burlington N. R.R. -- Stampede Pass Line, 1 S.T.B. 731, 735-736 (1996) (ICCTA's preemption clause "does not usurp the right of [S]tate and local entities to impose appropriate public health and safety regulation on interstate railroads," so long as those regulations do not "'conflict with' [F]ederal regulation, 'interfere with' [F]ederal authority, or 'unreasonably burden' interstate commerce").

On the record before us, the defendants in this case have not shown that the Prevailing Wage Act interferes with or unreasonably burdens railroading.  Notably, the Prevailing Wage

_____

[25] "[C]onstruction," for example, is commonly understood as "[t]he act of building by combining or arranging parts or elements," Black's Law Dictionary 391 (11th ed. 2019), not the wages paid for the labor involved in building.

Act has little, if any, "adverse economic effect on aspects of the railroads' operations." Emerson v. Kansas City S. Ry., 503 F.3d 1126, 1132 (10th Cir. 2007). The economic impact of the Prevailing Wage Act is, by design, absorbed by the Commonwealth. See, e.g., Friends of the Eel River v. North Coast R.R. Auth., 3 Cal. 5th 677, 723 (2017), cert. denied, 138 S. Ct. 1696 (2018) (Congress did not intend with ICCTA to "preempt a [S]tate's adoption and use of the tools of self-governance" with its own freight rail transportation projects "or to leave the [S]tate, as owner, without any means of establishing the basic principles under which it will undertake significant capital expenditures"). Specifically, a contractor is expected to calculate its labor costs using the prevailing wage schedule published by the DLS in its bid. The prevailing wage schedule becomes part of the winning bidder's contract with the Commonwealth; and the contractor must pay its laborers the relevant prevailing wage, presumably using the revenues it receives from the State. See Anzivino, Are the States' "Prevailing Wage Laws" Constitutional?, https://www.scholarship .law.marquette.edu/cgi/viewcontent.cgi?article=1407&context= facpub [https://perma.cc/3HM5-XSG5] (under State prevailing wage laws, State "pays a premium for construction work done on public projects and, in consideration of such premium, requires all

contractors working on these projects to pay their employees 'prevailing wages' in the construction industry").[26]

Indeed, no railroad is required to bid on a public works project; when a railroad voluntarily chooses to submit a bid, it is some evidence that the railroad has determined that compliance with the Prevailing Wage Act does not unreasonably burden its railroading activities.  The decision of the United States Court of Appeals for the Fourth Circuit in PCS Phosphate Co. v. Norfolk S. Corp., 559 F.3d 212, 221 (4th Cir. 2009), is instructive.  In PCS Phosphate Co., a railroad entered a contract with a mine owner, agreeing to pay to relocate rail lines that served the mine.  Id. at 215.  The railroad failed to pay, and, in response to the owner's subsequent claim for breach of contract, argued that the contract claim was preempted by the ICCTA.  Id. at 216-217.  The Fourth Circuit disagreed, concluding that enforcement of the railroad's voluntary agreements with the owners was not "regulation" expressly preempted by the ICCTA.  Id. at 218.  The court rejected the

---

[26] Contrary to the defendants' argument that the increased cost of paying prevailing wages to MCR's laborers burdens MCR's operations, nothing in the present record suggests payment of a prevailing wage would pose an undue burden.  Cf. Holland v. Delray Connecting R.R., 311 F. Supp. 2d 744, 755, 757 (N.D. Ind. 2004) (denying motion to dismiss on ICCTA preemption question where "devastating degree of [Federal Coal Industry Retiree Health Benefit Act's] impact poses a factual question on which [the railroad] must offer proof").

railroad's contention that the ICCTA expressly preempted all voluntary agreements concerning rail transportation, determining that the argument was unsupported by the purpose of the ICCTA to deregulate the railroad industry. Id. at 219.

Enforcement of the parties' agreements, the Fourth Circuit concluded, would not "unreasonably interfer[e] with rail transportation" (quotation and citation omitted) because the agreements "were freely negotiated between sophisticated business parties" and "reflect[ed] a market calculation that the benefits of operating the rail line for many years would be worth the cost of paying to relocate the line in the future."[27] PCS Phosphate Co., 559 F.3d at 220-221. "In the context of voluntary agreements, [courts] let the market do much of the work of the benefit-burden calculation." Id. at 221. The court also noted, "[a]s the STB has recognized, 'voluntary agreements must be seen as reflecting the carrier's own determination and admission that the agreements would not unreasonably interfere with interstate commerce.'" Id., quoting Woodbridge vs. Consolidated Rail Corp., 5 S.T.B. 336, 340 (2000). Thus, the court concluded that enforcement of valid voluntary agreements between private parties did not "fall into the core of economic

---

[27] For this reason, the Fourth Circuit also rejected the argument that enforcement of the agreements was impliedly preempted by the ICCTA. PCS Phosphate Co., 559 F.3d at 220-221.

regulation that the ICCTA was intended to preempt" and was therefore not preempted by the ICCTA. PCS Phosphate Co., supra at 219. Accord Friends of the Eel River, 3 Cal. 5th at 723 (enforcement of State environmental standards on State public works projects was not "regulation" preempted by ICCTA).

Like the terms of the contracts held to be enforceable despite the ICCTA's express preemption clause in PCS Phosphate Co., 559 F.3d at 221, the Prevailing Wage Act sets forth contractual terms governing public works projects voluntarily agreed to by the contractor, here, a railroad. Each contract reflects the railroad's determination, based on market conditions, that agreeing to pay its laborers the prevailing wage in exchange for the revenues it will receive from the Commonwealth for the public works project is "worth" it. Id.[28] Contrary to the defendants' argument, where a railroad voluntarily bids on a public works contract, and then freely agrees to public works project contractual provisions with prevailing wage rate schedules incorporated therein, that choice

---

[28] The fact that, as here, one party to the contract is a subdivision of a State does not alter our conclusion. See Building & Constr. Trades Council of the Metro. Dist. v. Associated Bldrs. & Contrs. of Mass./R.I., Inc., 507 U.S. 218, 231-232 (1993) ("In the absence of any express or implied indication by Congress that a State may not manage its own property when it pursues its purely proprietary interests, and where analogous private conduct would be permitted, [the United States Supreme Court] will not infer such a restriction").

supports the contention that the railroad has determined that the benefits of completing the project outweigh the cost, including the cost of paying prevailing wages to its workers.[29]

Moreover, the Prevailing Wage Act is akin to the type of State law that other Federal courts and the STB have concluded are not preempted by the ICCTA. Specifically, the Prevailing Wage Act "concerns a subject of traditional State regulation." Felix A. Marino Co., 426 Mass. at 463. Accord Dilts v. Penske Logistics, LLC, 769 F.3d 637, 646 (9th Cir. 2014) ("generally applicable background regulations that are several steps removed from prices, routes, or services, such as prevailing wage laws or safety regulations, are not preempted, even if employers must factor those provisions into their decisions about the prices that they set, the routes that they use, or the services that

---

[29] Nor does "[t]he fact that the statute may prevent the [r]ailroad from maximizing its profits . . . render the statute unreasonably burdensome" and thus preempted. Adrian & Blissfield R.R. v. Blissfield, 550 F.3d 533, 541 (6th Cir. 2008). See Florida E. Coast Ry., 266 F.3d at 1338 n.11 ("No statement of purpose for the ICCTA, whether in the statute itself or in the major legislative history, suggests that any action which prevents an individual firm from maximizing its profits is to be pre-empted"). "Although the 'costs of compliance' with a [S]tate law could be high, 'they are "incidental" when they are subordinate outlays that all firms build into the cost of doing business.'" Adrian & Blissfield R.R. supra, quoting New York Susquehanna & W. Ry., 500 F.3d at 254. In fact, the Prevailing Wage Act furthers the ICCTA's statement that "[i]n regulating the railroad industry, it is the policy of the United States Government . . . to encourage fair wages and safe and suitable working conditions in the railroad industry." 49 U.S.C. § 10101(11).

they provide"); People v. Pac Anchor Transp., Inc., 59 Cal. 4th 772, 786-787 (2014), cert. denied, 574 U.S. 1153 (2015) (identifying State prevailing wage law as generally applicable law).

The Prevailing Wage Act is "settled and defined," Green Mountain R.R. v. Vermont, 404 F.3d 638, 643 (2d Cir.), cert. denied, 546 U.S. 977 (2005); it sets forth the process by which a prevailing wage schedule for labor performed on public works is created and incorporated into public works contracts between the Commonwealth and its contractors, see G. L. c. 149, § 27 (commissioner of DLS determines prevailing wage schedule for public works, which is incorporated into call for bids, and then "[s]aid [prevailing wage] schedule shall be made a part of the contract for said works"). It "can be obeyed with reasonable certainty," Green Mountain R.R., supra, by paying laborers according to the prevailing wage schedule, see G. L. c. 149, § 27 ("schedule . . . shall continue to be the minimum rate or rates of wages for said employees during the life of the contract").

Compliance with the Act does not "entail . . . extended or open-ended delays." Green Mountain R.R., 404 F.3d at 643. Pursuant to the Prevailing Wage Act, contractors bidding on public works projects are aware of the schedule of prevailing wages, and if they choose to bid on the project, they are

expected to use the schedule in computing labor costs to include in their bids.  G. L. c. 149, § 27.

The Prevailing Wage Act involves no "discretion on subjective questions."  Green Mountain R.R., 404 F.3d at 643.  Contrast id. (ICCTA preempted environmental land use law because "railroad [would be] restrained from development until a permit [was] issued; the requirements for the permit [were] not set forth in any schedule or regulation that the railroad [could] consult in order to assure compliance; and the issuance of the permit await[ed] and depend[ed] upon the discretionary rulings of a [S]tate or local agency").

Furthermore, unlike State laws that Federal courts and the STB have determined to be preempted, the Prevailing Wage Act is not a permitting or preclearance process that could prevent, interfere with, or delay rail operations.[30]  See Riverdale, 4

---

[30] The STB and Federal courts have determined that, where a State permitting or preclearance process "could be used to frustrate or defeat an activity that is regulated at the Federal level, the [S]tate . . . process is preempted."  New York Susquehanna & W. Ry., 500 F.3d at 253, quoting Auburn & Kent, Wash. -- Petition for Declaratory Order -- Burlington N. R.R. -- Stampede Pass Line, 2 S.T.B. 330, 339 (1997).  See, e.g., Green Mountain R.R., 404 F.3d at 643 (ICCTA preempted preconstruction permitting requirement of State environmental land use law as applied to railroad transloading facility because it gave "the local body the ability to deny the carrier the right to construct facilities or conduct operations," activities falling within plain language of STB's jurisdictional grant [citation omitted]); Auburn v. United States, 154 F.3d 1025, 1031 (9th Cir. 1998), cert. denied, 527 U.S. 1022 (1999) (ICCTA preempted city environmental impact permitting requirements because they

S.T.B. at 386-389 (contrasting uniform building, plumbing, and electric codes, which generally are not preempted because they do not interfere with railroad operations, with local zoning ordinances, land use regulations, and environmental permitting requirements, which are preempted because they unreasonably prevent, delay, or interfere with activities protected by ICCTA).

Nor does the Act regulate the operational aspects of rail transportation, affecting the movement of property or passengers over the rail lines.[31]  See Emerson, 503 F.3d at 1131 (railroad's

_____

could be applied so as to prevent railroad "from constructing, acquiring, operating, abandoning, or discontinuing a line"); Soo Line R.R. v. Minneapolis, 38 F. Supp. 2d 1096, 1101 (D. Minn. 1998) (ICCTA preempted city's authority to withhold demolition permits sought by railroad to redevelop rail yard); Burlington N. Santa Fe Corp. v. Anderson, 959 F. Supp. 1288, 1292, 1296 (D. Mont. 1997) (ICCTA preempted Montana law giving State commission control over "maintenance, closure, consolidation[,] or centralization of railroad shipping facilities, stations[,] and station agencies" within State); CSX Transp., Inc., 944 F. Supp. at 1581-1582 (State statute requiring preapproval for closing of railroad agencies, which, inter alia, provided "services" concerning the movement of property and passengers via rail, preempted by ICCTA).

[31] Federal courts also have determined that State laws that interfere with the actual operational aspects by which railroad carriers move passengers or property are preempted.  See Emerson, 503 F.3d at 1132 (ICCTA preempts State laws that "would have an adverse economic effect on aspects of the railroads' operations that are within the STB's exclusive jurisdiction" [emphasis added]).  See, e.g., Friberg v. Kansas City S. Ry., 267 F.3d 439, 440, 443 (5th Cir. 2001) (State statute prohibiting train from blocking street for more than five minutes, as well as common-law negligence claim, each seeking to prescribe railroad's operation and its construction and

discarding of old railroad ties and vegetation into drainage ditch was not "transportation" and, thus, ICCTA's preemption clause did not preclude State tortious claims by landowners whose property was flooded by railroad's tortious conduct). Accordingly, the Prevailing Wage Act is not expressly preempted by the ICCTA.[32]  See PCS Phosphate Co., 559 F.3d at 221.

---

operation of side track, were preempted because "[r]egulating the time a train can occupy a rail crossing impacts . . . the way a railroad operates its trains, with concomitant economic ramifications"); Association of Am. R.R. vs. South Coast Air Quality Mgt. Dist., U.S. Dist. Ct., No. CV 06-01416-JFW (PLAx) (C.D. Cal. Apr. 30, 2007), aff'd, 622 F.3d 1094 (9th Cir. 2010) (regulation limiting idling time of unattended locomotives to thirty minutes or less was preempted because it "directly regulate[d] rail operations"); Engelhard Corp. v. Springfield Terminal Ry., 193 F. Supp. 2d 385, 389-390 (D. Mass. 2002) (claims for unpaid freight car mileage allowances were preempted because STB has statutory authority to establish third-party freight car rates of compensation); Rushing v. Kansas City S. Ry., 194 F. Supp. 2d 493, 500-501 (S.D. Miss. 2001) (ICCTA preempted State nuisance and negligence claims brought to quell noise and vibrations emanating from railroad's switching yard because they sought "to enjoin the [railroad] from operating its switch yard in the manner it currently employs"); CSX Transp., Inc. v. Plymouth, 92 F. Supp. 2d 643, 659 (E.D. Mich. 2000) (State law limiting time railroad blocks traffic, and requiring railroad to incur capital improvements on tracks to avoid same, preempted by ICCTA).

[32] Marsh alleges that he worked on projects, such as the South Coast Rail project, which he contends expressly fall outside the STB's jurisdiction.  In particular, the ICCTA provides that the STB does not have jurisdiction over "public transportation provided by a local government authority."  49 U.S.C. § 10501(c)(2).  A "local government authority" includes contractors, like MCR, who contract with a political subdivision or a State "to provide transportation services."  49 U.S.C. § 10501(c)(1)(A).  In light of the foregoing, we need not reach whether application of the Prevailing Wage Act is permitted, at

ii.  Field preemption.  We next consider the defendants'
contention that Congress has impliedly preempted the Prevailing
Wage Act,[33] turning first to field preemption.  See Freightliner
Corp. v. Myrick, 514 U.S. 280, 289 (1995) (express preemption
clause supports inference against, but does not necessarily
foreclose, implied preemption).  See, e.g., Florida E. Coast
Ry., 266 F.3d at 1329 n.3 (evaluating implied preemption claim
despite concluding ICCTA preemption clause did not expressly
preempt city's zoning and licensing ordinances).[34]

---

the least with regard to Marsh's work on the South Coast Rail
project, for this additional reason.

[33] "When Congress has considered the issue of pre-emption
and has included in the enacted legislation a provision
explicitly addressing that issue, and when that provision
provides a 'reliable indicium of congressional intent with
respect to [S]tate authority,'" Cipollone, 505 U.S. at 517,
quoting Malone v. White Motor Corp., 435 U.S. 497, 505 (1978),
"'there is no need to infer congressional intent to pre-empt
[S]tate laws from the substantive provisions' of the
legislation," Cipollone, supra, quoting California Fed. Sav. &
Loan Ass'n v. Guerra, 479 U.S. 272, 282 (1987).  "Such reasoning
is a variant of the familiar principle of expression unius est
exclusio alterius:  Congress'[s] enactment of a provision
defining the pre-emptive reach of a statute implies that matters
beyond that reach are not pre-empted." Cipollone, supra.

[34] Federal cases considering implied preemption despite the
existence of an express preemption provision understandably have
focused on conflict preemption.  See, e.g., Freightliner Corp.,
514 U.S. at 288-289; Florida E. Coast Ry., 266 F.3d at 1329 n.3.
We nonetheless consider the defendants' argument that the
Prevailing Wage Act is preempted under the doctrine of field
preemption, as the defendants' arguments in this regard
apparently do not rely on the ICCTA or its statutory framework.

Field preemption occurs where "[F]ederal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it" (quotation and citation omitted). Cipollone, 505 U.S. at 516. "Where . . . the field which Congress is said to have pre-empted includes areas that have been traditionally occupied by the States, congressional intent to supersede [S]tate laws must be clear and manifest" (quotations and citation omitted). English, 496 U.S. at 79. See, e.g., Terminal R.R. Ass'n of St. Louis v. Brotherhood of R.R. Trainmen, 318 U.S. 1, 6 (1943) (Railway Labor Act did not occupy field of railroad working conditions where it did not "undertake governmental regulation of wages, hours, or working conditions," but instead sought to "provide a means by which agreement may be reached with respect to them").

"In order to determine whether Congress has implicitly ousted the States from regulating in a particular field, we must first identify the field in which this is said to have occurred." Garcia, 140 S. Ct. at 804. Even assuming arguendo that, here, the field is the wages of railroad employees, as opposed to wages paid on public works projects, see, e.g., Wisconsin Cent., Ltd. v. Shannon, 539 F.3d 751, 761, 765 (7th Cir. 2008) (identifying field as "overtime wages for railroad employees"); R.J. Corman R.R./Memphis Line v. Palmore, 999 F.2d 149, 151 (6th Cir. 1993) (identifying field as "overtime

regulation of interstate railroads"); Alvarez vs. Anacostia Rail Holdings Co., N.Y. Sup. Ct., No. 157154/2021 (Oct. 28, 2022) (noting parties' "agree[ment] that the field at issue is the wages and hours of railroad employees"), the defendants have not demonstrated that the field is preempted by Federal law.

Despite the plethora of Federal statutes governing railroads, see R.J. Corman R.R./Memphis Line, 999 F.2d at 151-152, the only Federal law specifically relied on by the defendants that addresses railroad workers' wages is the Adamson Act of 1916, Pub. L. No. 64-252, 64th Cong., 1st Sess., c. 436, § 3, 39 Stat. 721 (Adamson Act), which temporarily "forb[ade] any lowering of wages" to avert a nationwide railroad union strike.[35] Wilson v. New, 243 U.S. 332, 345 (1917). At the time, railroads had rejected the unions' demanded reduction in railroad employees' work hours from ten hours to eight, and an increase in overtime pay, id. at 340-341; Federal mediation efforts had failed, id. at 342. Facing a national crisis, the President of the United States requested that Congress enact

---

[35] We note that the defendants' sole reference to the Adamson Act appears in a quotation from Sumlin vs. BNSF Ry., U.S. Dist. Ct., No. EDCV 17-2364-JFW (KKx) (C.D. Cal. Apr. 10, 2018). Although that case discusses the Adamson Act, the State laws at issue there fell within a field -- "regulation of working hours and rest for train employees" -- that was occupied by Federal law where the Federal Hours of Service Act, Pub. L. No. 59-274, 59th Cong., c. 2939, 34 Stat. 1415 (1907), required that train employees be provided with rest periods of at least ten consecutive hours prior to working. Sumlin, supra.

legislation to prevent a strike.  Id.  Congress responded by enacting the Adamson Act, which, inter alia (1) established an eight-hour work day for railroad workers; (2) authorized the creation of a commission to study the effects of the eight-hour standard work day and report its findings; and (3) pending the release of the report, and for a period of thirty days thereafter, temporarily prohibited the lowering of wages.  Id. at 343-344, citing Pub. L. No. 64-252, c. 436, §§ 1-3, 39 Stat. 721.  In sum, the Adamson Act's regulation of railroad wages was limited to an eleven-month period between 1916 and 1917, until such time as a report could be issued that considered whether the eight-hour workday would affect railroads' profitability and whether Federal regulations on rates charged by the railroads should be adjusted to compensate the railroads for any additional labor costs.  See Wilson, supra at 345-346.

Relying principally on the Adamson Act, the United States Courts of Appeals for the Sixth and Seventh Circuits have determined that State overtime wage laws as applied to railroad workers were preempted under the doctrine of field preemption. See Wisconsin Cent., Ltd., 539 F.3d at 765 (Illinois overtime wages statute as applied to railroad workers preempted); R.J. Corman R.R./Memphis Line, 999 F.2d at 152 & n.3, 153 (Kentucky overtime wages statute preempted as to railroad workers). Specifically, the courts read the Supreme Court's decision in

Wilson to conclude that the Adamson Act evinced Congress's intent to leave wages to the free market negotiations between railroads and their employees, preempting State overtime statutes. See Wisconsin Cent., Ltd., supra (stating that Supreme Court in Wilson indicated that Congress intended to leave railroad workers' wages "free" from any regulation following temporary restriction on lowering of wages); R.J. Corman R.R./Memphis Line, supra (relying on Wilson for proposition that Congress intended with Adamson Act to leave railroad worker compensation to labor agreements).

But a closer review of the Supreme Court's decision in Wilson shows that the Court did not determine that the Adamson Act mandated a laissez faire approach to wage negotiations between railroads and employees. The Court addressed only the question whether the mandatory eight-hour day and the temporary restriction on the lowering of wages were constitutional as a permissible exercise of Congress's authority to regulate interstate commerce. Wilson, 243 U.S. at 340, 345-346. The Court's statement that the Adamson Act's restriction on the lowering of railroad employees' wages was "not permanent but temporary, leaving the employers and employees free as to the subject of wages to govern their relations by their own agreements after the specified time," id. at 345-346, was relevant to the Court's analysis of whether Congress had

exceeded its commerce clause authority. Contrary to the conclusion of the Sixth and Seventh Circuits, the Supreme Court's statement was not a determination of Congress's intent to occupy the field of railroad workers' wages; indeed, the prevailing view at the time was that "allowing the parties to freely bargain the price of labor was a more enlightened theory when compared with price caps and maximum wage limits that previously existed in English statutes." Alvarez, N.Y. Sup. Ct., No. 157154/2021.

More importantly, as discussed supra, the Adamson Act prohibited the lowering of railroad employee wages temporarily in an effort to avert a strike, which would have been catastrophic. The temporary restriction on the lowering of wages was accompanied by a mandate to study the effects on the railroad industry of an eight-hour workday. See Wilson, 243 U.S. at 344. Nothing in the legislation or its surrounding circumstances supports the conclusion that Congress intended by the statute to forever ban State laws regarding minimum wages as applied to railroad workers, much less a ban on State prevailing wage laws. See Alvarez, N.Y. Sup. Ct., No. 157154/2021.

Moreover, the Supreme Court consistently has held that although Congress can create a "federally mandated free-market control" scheme, it cannot do so "subtly." Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp., 485 U.S. 495, 500

(1988). See id. at 502-503 (local gasoline price regulation was not preempted by field preemption despite Congress's passage and subsequent repeal of Federal legislation providing for price controls on petroleum products because congressional action did not evince intent for federally mandated free market). Rather, the Supreme Court has instructed "that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress" (citation omitted). Id. at 500. See Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 252 (1994), quoting Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 21 (1987) (employee's wrongful discharge action not preempted by mandatory arbitration provision of Federal Railway Labor Act because "[p]re-emption of employment standards 'within the traditional police power of the State' 'should not be lightly inferred'").

The same conclusion portends here. Nothing in the temporary wage reduction restriction in 1916 evinces a congressional intent to occupy the field of railroad employee wages or to preempt any State laws securing wage protections for railroad employees on public works projects.[36]

---

[36] This conclusion in no way suggests that we have canvassed the entirety of Federal railroad regulation; we have reviewed only the arguments and Federal statutes presented to us in the defendants' briefs.

iii. <u>Conflict preemption</u>. We turn next to the defendants' argument that the Prevailing Wage Act is preempted under the doctrine of conflict preemption. Conflict preemption occurs if "compliance with both [S]tate and [F]ederal law is impossible . . . or when the [S]tate law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (quotation and citation omitted). <u>Michigan Canners & Freezers Ass'n</u> v. <u>Agricultural Mktg. & Bargaining Bd</u>., 467 U.S. 461, 469 (1984).

The defendants maintain that the Prevailing Wage Act conflicts with the Davis-Bacon Act, 23 U.S.C. § 113, which requires that contractors on federally funded construction projects pay certain employees the prevailing wage rate, at a minimum, for their job classification as determined by the Federal Secretary of Labor. See 40 U.S.C. §§ 3141-3148. The defendants assert that requiring State prevailing wages to be paid on State public works projects would conflict with the Federal Department of Transportation's determination that the Davis-Bacon Act's prevailing wage requirements for federally funded projects do not apply to federally funded railroad projects. See United States Department of Transportation, Federal Highway Administration, Memorandum on Utility and Railwork -- Wage Rate and EEO Requirements (May 15, 1985).

We are persuaded by the Seventh Circuit's analysis in <u>Frank</u>
<u>Bros</u>. v. <u>Wisconsin Dep't of Transp</u>., 409 F.3d 880, 895-897 (7th
Cir. 2005), which rejected a similar argument.  In particular,
the Seventh Circuit addressed the contractor's contention that
its compliance with the State's prevailing wage act in
connection with wages paid to truck drivers on State public
works projects conflicted with the determination that truck
drivers were excluded from those employees to whom contractors
must pay, at a minimum, the federally determined prevailing wage
on federally funded projects under the Davis-Bacon Act.  <u>Id</u>. at
894.  Declining to adopt the contractor's argument, the court
explained that the purpose of the Davis-Bacon Act was to protect
workers by setting a "floor" for the wage to be paid to workers
on federally funded public works.  <u>Id</u>. at 897.  "[N]othing in
the Davis-Bacon Act . . . specifically or expressly <u>prohibit[ed]</u>
paying truck drivers a prevailing wage."  <u>Id</u>.  "Were this court
to hold that Wisconsin was precluded from requiring that truck
drivers are paid a minimum wage, we would not be advancing the
goals of Congress in any meaningful way; indeed, we may even be
doing damage to those objectives."  <u>Id</u>. at 896.  The State's
"prevailing wage legislative scheme is supplemental in nature
and thus there is nothing barring [the contractor] from
complying with both [F]ederal and [S]tate law," the court

reasoned.  Id. at 897.  The same is true for railroad workers working on the Commonwealth's public works projects.[37]

d.  Public works projects.  Finally, the defendants assert that Marsh's Prevailing Wage Act claims must be dismissed because the projects on which Marsh worked were not public works; in particular, they maintain that MCR's agreement with the Commonwealth was not the result of a competitively advertised and bidding process, that the project was not awarded to the lowest bidder, that the Massachusetts Department of Transportation (MassDOT) did not incorporate a prevailing wage schedule into the agreement, and that the work was not a

---

[37] The defendants also maintain that Marsh's claims violate the dormant commerce clause.  See Northeast Patients Group v. United Cannabis Patients & Caregivers of Me., 45 F.4th 542, 545 (1st Cir. 2022), quoting South-Cent. Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 87 (1984) (commerce clause is also "a negative, 'self-executing limitation on the power of the States to enact laws [that place] substantial burdens on [interstate] commerce'").  See also National Pork Producers Council v. Ross, 143 S. Ct. 1142 (2023), quoting Department of Revenue of Ky. v. Davis, 553 U.S. 328, 337-338 (2008) ("the [c]ommerce [c]lause prohibits the enforcement of [S]tate laws 'driven by . . . "economic protectionism -- that is, regulatory measures designed to benefit in-[S]tate economic interests by burdening out-of-[S]tate competitors"'").  Nothing in the defendants' cursory arguments in this regard establishes that requiring workers on State public works projects be paid, at a minimum, a prevailing wage burdens interstate commerce or, in any manner, discriminates against out-of-State vendors.  See Pascazi v. Gardner, 106 A.D.3d 1143, 1145 (N.Y. 2013) ("Petitioner's claim that the prevailing wage law violates the dormant [c]ommerce [c]lause is . . . unavailing as the law applies equally to in-[S]tate and out-of-[S]tate contractors that choose to engage in public works projects").  See also note 29, supra.

"utility" under G. L. c. 6C, § 44.[38]  Support for these assertions, however, does not appear on the face of the complaint.[39]

At this point in the litigation, Marsh need not prove that he performed work on "public works" projects.  See Lanier, 490 Mass. at 43 (at pleading stage, plaintiff need only set forth "allegations plausibly [that] suggest that the plaintiff is entitled to relief").  See also Mass. R. Civ. P. 8 (a), 365 Mass. 749 (1974) ("A pleading which sets forth a claim for relief . . . shall contain [1] a short and plain statement of the claim showing that the pleader is entitled to relief, and [2] a demand for judgment for the relief to which he deems himself entitled").[40]

---

[38] For this last proposition, the defendants cite a MassDOT highway division opinion letter from May 1, 2015, which is not controlling.  See Mullally, 452 Mass. at 533 (deferring to DLS's interpretation of Prevailing Wage Act).

[39] Accordingly, we do not reach the issue whether this evidence, if ultimately shown by the defendants on summary judgment or at trial, would require judgment in favor of the defendants.

[40] For at least this reason, the defendants' alternative argument, that Marsh's G. L. c. 149, § 27F, claim should be dismissed because Marsh was not an operator of rented equipment, is unsupportable at the motion to dismiss stage.  Indeed, § 27F's application is not limited to operators of rental equipment.  See G. L. c. 149, § 27F.

In his complaint, Marsh alleges that MCR contracted with the Commonwealth on public works projects,[41] including, inter alia, the South Coast Rail project to restore commuter rail access,[42] that he was employed by MCR and worked on such projects as a laborer operating equipment such as backhoes, tampers, boom trucks, and loaders,[43] and that he was not paid the applicable

---

[41] The defendants do not suggest that, in certifying the complaint, including the statement that the projects on which Marsh worked were on "information and belief" public works projects under G. L. c. 149, § 27, Marsh's counsel failed to comply with their ethical responsibilities to verify the grounds for such pleading. See Mass. R. Civ. P. 11 (a) (1), as appearing in 488 Mass. 1403 (2021) ("The signature of any attorney to a pleading constitutes a certificate that . . . to the best of the attorney's knowledge, information, and belief there is a good ground to support it").

[42] As alleged, the South Coast Rail project was undertaken pursuant to a contract with MassDOT to serve a public purpose of providing commuter transportation and included alterations to land. See Perlera v. Vining Disposal Serv., Inc., 47 Mass. App. Ct. 491, 493-494 (1999) ("The core concept of 'public works,' in Massachusetts and elsewhere, is commonly expressed as involving the creation of public improvements having a nexus to land"); Black's Law Dictionary 1606 (6th ed. 1990) (defining "[p]ublic works" as "[w]orks, whether of construction or adaptation, undertaken and carried out by the national, [S]tate, or municipal authorities, and designed to subserve some purpose of public necessity, use, or convenience; such as public buildings, roads, aqueducts, parks, etc."). See, e.g., O'Leary v. New Hampshire Boring, Inc., 176 F. Supp. 3d 4, 9-11 (D. Mass. 2016) (declining to dismiss complaint alleging construction laborer on commuter transportation project was not paid prevailing wage).

[43] "[C]onstruction" is broadly defined under the Prevailing Wage Act to include "additions to and alterations of public works." G. L. c. 149, § 27D. Marsh alleges that "[s]ome of the work [he] performed at Public Works Projects, such as operating a backhoe to dig and/or tampers to tamp, required additions and/or alterations to public property and/or public works."

prevailing wage when he performed work on these projects. The factual allegations "'plausibly suggest[]. . .' an entitlement to relief." Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007). See, e.g., O'Leary v. New Hampshire Boring, Inc., 176 F. Supp. 3d 4, 9-11 (D. Mass. 2016) (declining to dismiss claim alleging violation of Prevailing Wage Act where complaint averred employee did boring and drilling construction work for employer, which had contract with MassDOT to extend Massachusetts Bay Transportation Authority's green line, and rejecting contention that complaint also had to allege that MassDOT designated project as public works project, DLS issued prevailing wage schedule, and contract was publicly bid and advertised alongside wage schedule).[44]

3. Conclusion. For the foregoing reasons, we affirm the order denying the defendants' motion to dismiss.

So ordered.

---

[44] The defendants urge us to dismiss Marsh's claims because railroads are not an enumerated public work in G. L. c. 30, § 39G. See id. (listing "public ways, including bridges and other highway structures, sewers and[] water mains, airports[,] and other public works"). But the enumerated categories include "other public works," and as explained, see note 42, supra, commuter transportation construction projects can fall within the meaning of "public works."